## Case No. 12,253.

### In re SALKEY et al.

[6 Biss. 269;[1] 11 N. B. R. 423; 7 Chi. Leg. News, 178.]

District Court, N. D. Illinois. Jan. 9, 1875.

BANKRUPTCY — SURRENDER OF PROPERTY — DE-
PLETION OF STOCK—FAILURE TO AC-
COUNT—CONTEMPT.

1. If it appears to the district court that a bankrupt has neglected or refused to surrender

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

any property which ought to come into the bankruptcy court, or fails or refuses to give a satisfactory account of his property or his dealings previous to bankruptcy, the court may order him to surrender such property, or properly account for it, and on failure so to do he may be committed for contempt. .

[Cited in Re Mooney, Case No. 9,748; In re How, Id. 6,747.]

2. Where property is traced to the bankrupt, it is not a sufficient answer that he cannot say what became of it. The court must be satisfied that the bankrupt has fully and honestly accounted for the property according to the facts.

3. Where just prior to the proceedings in bankruptcy the bankrupt's stock of goods was rapidly diminishing, and not in the ordinary course of business, the legitimate conclusion is that it was fraudulently removed and concealed, and the bankrupt will be presumed to still have control of it.

In bankruptcy. Motion to commit bankrupts [Samuel Salkey and Joseph Gerson] for contempt in not accounting for assets.

On the 8th of October, 1873, certain creditors of Salkey & Gerson filed their petition asking that they be adjudicated bankrupts; and on the 23d of December a trial was had upon the issues in the case, denying the acts of bankruptcy charged, and a verdict rendered, finding the debtors guilty of the several acts of bankruptcy charged, upon which they were adjudicated bankrupt in due form. Pending the proceedings, and before the trial, on the application of the provisional assignee and certain creditors, an examination of the bankrupts was had under oath, before the register touching their estate. And on the 19th of January, a further examination was had at the instance of certain creditors, under the 26th section of the bankrupt law [of 1867 (14 Stat. 529)], which examination was duly reported to the court by the register, and from which it appeared, first, that the bankrupts were, from the first day of January, 1873, to the filing of the petition in bankruptcy against them, co-partners doing business as merchants in Chicago, under the firm name of Salkey & Gerson, their business being mainly that of wholesale and retail dealers in clothing and gentlemen's furnishing goods, and to some extent manufacturers of such goods; second, that said firm had, at the time of commencing business as aforesaid, goods and merchandise of the value of eleven thousand dollars on hand; that they had also outstanding accounts of the firm of Salkey, Lebrecht & Co., of which Salkey & Gerson were the successors, to the value of over forty-five hundred dollars; and owed Lebrecht, the late partner, forty-five hundred dollars, for which he held the accounts of the old firm as security; in other words, that Salkey & Gerson, at the time they commenced business, had invested in goods at a fair cash valuation, for the purposes of their business, over eleven thousand dollars, and owed, substantially, nothing; third, that between the said first day of January, 1873, and the filing of said petition in

bankruptcy, said firm purchased goods and merchandise which went into their store, and which had not been paid for at the time proceedings in bankruptcy were commenced, to the amount of over thirty-five thousand dollars; fourth, that the total assets turned over by said firm to the assignee, were not, at the valuation put upon them by the bankrupts themselves, worth over nine thousand dollars, and no attempt was made to account for this deficiency. On the returning into court of the evidence taken before the register on this examination, a hearing was had, in which the court found and adjudged from said proof, that said bankrupts had a large amount of assets in their hands during the year preceding their bankruptcy, for which they gave no satisfactory account, and ordered that the bankrupts appear before H. N. Hibbard, Esq., one of the registers of this court, on the 31st day of January, 1874, and such other times as the register should appoint, and give a true and satisfactory statement and account of the assets of said firm, and what had become of the same, and where they then were; and that said statement be given under oath and reduced to writing by the register, and returned into court. The bankrupts accordingly appeared before the register on the day named in said order, and stated under oath, in substance, that they had no further account to give of their said assets. Motion was then made that the bankrupts be committed to jail for contempt in not accounting for and delivering to their assignee the said deficiency between the assets traced to their hands by their own admissions under oath, and what they had already surrendered.

[For prior proceedings in this litigation, see Case No. 12,252.]

Tenneys, Flower & Abercrombie, for creditors.
Grant & Swift, for bankrupts.

BLODGETT, District Judge. This motion has been taken under advisement, and carefully considered, because of the importance of the question involved, bearing not only upon the rights and interests of these men, but upon the general administration of the bankrupt law.

By the 26th section of the bankrupt law it is provided: "That the court may, on the application of the assignee in bankruptcy, or of any creditor, or without any application, at all times require the bankrupt, upon reasonable notice, to attend and submit to an examination on oath, upon all matters relating to the disposal or condition of his property; to his trade and dealings with others, and his accounts concerning the same; to all debts due or claimed from him; and to all other matters concerning his property and estate, and the due settlement thereof according to law; which examination shall be in writing, and shall be signed by the bankrupt, and

be filed with the other proceedings.". * * *

"The bankrupt shall, at all times until his discharge, be subject to the order of the court, and shall, at the expense of the estate, execute all proper writings and instruments, and do and perform all acts required by the court touching the assigned property or estate, and to enable the assignee to demand, recover, and receive all the property and estate assigned, wherever situated; and for neglect or refusal to obey any order of the court, such bankrupt may be committed and punished as for a contempt of court. * * * He shall also be at liberty, from time to time, upon oath, to amend and correct his schedule of creditors and property so that the same shall conform to the facts.".

I have been able to find few, if any, adjudged cases under our bankrupt law, throwing any light upon the powers and duties of the court in this proceeding, and must be guided mainly by general principles, and some analogous proceedings in the English bankrupt courts and courts of equity.

By the 160th section of 12 & 13 Vict., it is provided, that if the bankrupt shall not fully answer any lawful question put to him by the court, to the satisfaction of the court, he may be committed. And under this section it was held by the common bench of England, in Ex parte Bradbury, 78 E. C. L. 15, that where a bankrupt, on his examination before a commissioner, being asked why a certain check for £100, had been drawn in favor of his brother, who he admitted did not receive the money, and how the proceeds were appropriated, answered that his memory did not serve him, the commissioner committed him to prison for not answering to his satisfaction, and the court held that he was justified in so doing, Jervis, C. J., saying: "The question is, whether the commissioner was reasonably bound to be satisfied, when the bankrupt, in answer to inquiries as to why his brother's name was inserted in the £100 check, and how the money was appropriated, merely said that his memory did not serve him. The substance of his answer, is, 'I know nothing at all about the transaction.' That clearly could not be satisfactory. If the bankrupt had assigned any reason for his want of recollection, the commissioner might have pursued the inquiry, but all inquiry was effectually closed by the answer." Maule, J., says: "I agree with my lord chief justice, in thinking that there is no ground to quarrel with the commitment in this case. The commissioner must, to say the least, be a very credulous person, if he had been satisfied with such answers as those set out in the warrant. Here is a sum of £100 drawn out of the banker's on a particular and not very distant day; the man is asked what became of it, and he professes that his mind is a perfect blank on the subject. It would really be too absurd to be satisfied with such an answer."

In Ex parte Nowlan, reported in 6 Durn. & E. [6 Term R.] 118, it is in substance said:

If on the examination of a bankrupt touching the disposition of his property, he swear to an account of the same, which appears to be incredible, the commissioners may commit him to prison.

This case arose under the bankrupt act passed in 5 Geo. II. which authorizes the commissioners to commit the bankrupt if he do not answer to their satisfaction. Lord Kenyon, C. J., says: "There are no technical rules, by which cases of this kind are determined, but the question in each particular case is, whether the answers given by the bankrupt be or be not sufficient to satisfy the mind of any reasonable person." Ashhurst, J., says: "It would be a ridiculous ceremony for the commissioners to go through in examining a bankrupt, if they were bound to give credit to his account, however improbable or absurd it might be, merely because he has the effrontery to swear to it. In these cases they are to exercise their judgment upon the whole."

In Taylor's Case, reported in 8 Ves. 328, the commital of a bankrupt was held valid, though he swore positively to his answers, as it was made to appear that they were not reasonably satisfactory to the commissioners, Lord Chancellor Eldon saying that the answers "must be reasonably satisfactory to the mind that is to decide" upon them. "The commissioners have a duty imposed upon them, as well as an authority to get out an account and discovery for the benefit of the creditors; and if he does not make a satisfactory answer for the purpose of enabling them to exercise their duty, they have authority to commit. If the authority depends upon the point whether the answer is satisfactory, those who have that authority must exercise it upon their judicial examination and view of the answer upon the point, whether it is satisfactory or not."

So too, in Ex parte Lord, 16 Mees. & W. 462, the court refused to discharge the bankrupt from custody "for not answering questions to the satisfaction of the commissioner, where they were of opinion that the story contained in his answers is not such as to satisfy a reasonable person of its truth."

There is also a close analogy between this case and that of a defendant in a suit in equity, brought by creditors when the debtor is required to surrender his assets to a receiver, in which any refusal to deliver over assets, or satisfactorily account for them, is punished as a contempt. 2 Daniell, Ch. Prac. 1742.

So a refusal by a party in a chancery suit, to obey any order of the court, subjects the party guilty of such refusal to punishment for contempt. Crook v. People, 16 Ill. 534; Hill v. Crandall, 52 Ill. 70; Wightman v. Wightman, 45 Ill. 167.

The district court as a court in bankruptcy is clothed with all the powers of a court of equity. When a man is adjudicated bankrupt, he is bound to schedule and surrender to

the proper officers of the court all his assets. And if it is made to appear to the court by an examination under the 26th section, or in any other manner, that the bankrupt has refused or neglected to surrender any portion of his property which he ought to have surrendered in the first instance, he may be ordered to surrender such property, and if he fails to do so he may be punished for contempt. And the delegation to the court of power to require an account to be given by the bankrupt of all matters relating to the disposal of his estate, and his dealings with others, and acts concerning the same, implies of itself a power to punish if a satisfactory account is not given. The court, in other words, must be satisfied that the bankrupt has rendered a full and complete account of his property, and given a true statement of the disposal of the same, and if the bankrupt fails to so satisfy the court, he is liable to the process for contempt. Not that the court can capriciously or unreasonably insist upon explanations which are not necessary to a full understanding of the bankrupt's affairs, but the judicial mind must be satisfied, after full examination and opportunity for explanation, that the bankrupt has not fully accounted for the property which has been in his possession.

The power vested in a court of justice to punish for contempt, for the purpose of enforcing its decrees and orders, and, especially in cases like this, is one which should be, to use the language of Lord Eldon in Taylor's Case, "sparingly exercised," and only in cases where there can be no doubt of its propriety.

In Dresser's Case [Case No. 4,077], the bankrupt returned by his schedule a sum of money on hand; failing to deliver it to his assignee, he was called upon to account for it, and stated that he had used it between the time of filing his petition and the election of the assignee, and the court ordered him committed for contempt, until he should pay it over to the assignee.

Our bankrupt law contains no special authority to commit for refusal to answer or account to the satisfaction of the court; and yet it seems to me there can be no doubt that the principle running through all the cases which I have cited is clearly involved in our law. The bankrupt, when on examination, after admitting the possession of property, must clearly account for the same to the satisfaction of the court; otherwise he must be held to still have it in his possession, and be able to hand it over to his assignee, and on failing or refusing to account in a reasonable manner for the disposition of assets which have been traced to him, must be held to be acting in contempt of the jurisdiction of the court.

The bankrupts in this case occupy substantially the attitude of saying to the court: We have had in our possession assets to the value of over $20,000, between January and October, 1873, and refuse to give any account thereof. We have not turned them over to our assignee. We do not admit we have them now in our possession. The court and creditors must help themselves; do the best you can; we stand mute, and refuse to throw any light upon the subject of the disposition of this large amount of funds.

Is the court to sit tamely by and be baffled by such acts of practical contumacy on the part of a bankrupt? Perhaps no more forcible illustration of the necessity of the exercise of the powers specifically granted to the English bankrupt court, and as I have claimed, impliedly granted to the bankrupt courts under our law, could be imagined than the case before us. Here the bankrupts admit that between the first of January, 1873, and the time that proceedings in bankruptcy were commenced against them, they had merchandise and property in their possession which they had purchased on credit and not paid for, to the value of over $35,000. They refuse to explain what has become of that property; they offer no hypothesis to account for its disappearance; but simply say, in response to the final order for accounting, that they have no further account to give. Can it be said that any reasonable mind should be satisfied with such an accounting by a bankrupt for his assets? Can it be said that a court charged with the administration of the estate of a bankrupt. and bound to see that all the estate goes to the assignee for the benefit of creditors, is to be satisfied on such a showing that the bankrupts have honestly turned over to the officers of the court all their assets? Ought the court to be put off with mere silence or refusal, or neglect to account in a reasonable manner for assets traced clearly to and admitted by the bankrupts themselves to have been in their hands and under their control at so recent a date? The administration of bankrupt estates is in the main unsatisfactory enough at best, but how much more must it be if there is no power to unearth concealed assets, and compel bankrupts to disgorge their hidden property? The duty of the bankrupt is to honestly account for his assets according to facts. He may have lost his property by unfortunate speculations, or gambling even, so that it is beyond his reach or that of his assignees, and a true statement of the facts would be an accounting for it. That is a showing what has become of it, within the intention of the law, but until some explanation is made, the court must hold the bankrupt answerable.

If upon such an examination it is made to appear to the satisfaction of the court that a bankrupt has assets secreted which he has not delivered to his assignee, surely it could not be expected that the court should be content with the mere barren results of the information which the examination should give; but the court clearly has the power to enforce the surrender of the property, if it appears to the satisfaction of the court that it is still in the control of the bankrupts

themselves, or no disclosure is made to show that any other person has possession of it.

The conclusion is inevitable, from the admissions of the bankrupts in the examinations, that they still have the possession in some manner of those goods or their proceeds; or they have information and knowledge as to where the goods or proceeds can be found, and fraudulently withhold such information.

It appears from the evidence in this case, that for several weeks prior to the proceedings in bankruptcy, the goods of the bankrupts were manifestly disappearing from their store. Creditors calling there to collect their overdue bills, saw from day to day and from time to time, as they called, that the stock of goods was diminishing rapidly. And it cannot be supposed that the bankrupts, who were every day about the store, did not know where these goods went. They were not sold on credit in the usual way, for their books of account contain no outstanding accounts of any consequence. The only natural and legitimate conclusion must be that they have been fraudulently removed and concealed, for the purpose of defrauding the creditors, and that the bankrupts now know where these goods or their proceeds are. Honest men would at least make some attempt to explain this large depletion. It even appears that when creditors called for their pay, and mentioned the fact that the stock in the store was rapidly diminishing, they were laughed at, derided and defied by the bankrupts, and told they could not help themselves. And when the store was finally closed by the proceedings in bankruptcy, only goods to the beggarly amount of $6,000, at the bankrupts' own valuation, remained to represent the $35,000 of indebtedness which had been contracted by these men for goods which had gone into their store in the preceding eight months, and remained unpaid for.

There were no outstandings upon their books; no bills receivable; no assets, except the remnant of the stock of goods subsequently sold for less than $3,000, and the store fixtures.

If ever there was a case where the circumstances pointed indubitably to the conclusion that the bankrupts had deliberately and wilfully secreted their goods or the proceeds thereof, for the purpose of preventing them from coming into the hands of their creditors, this is such a case. And yet, on being arraigned and asked by the court to account for these goods, the bankrupts coolly say, they have no further account to give.

It seems to me that the court ought not to allow itself and the creditors of these men to be mocked in this way. It ought to compel these men to account for these goods, to tell where they have gone, to disgorge the proceeds or tell who has them, in order that the assignee may obtain them, and that not only that justice may be done to the credit-

ors of these bankrupts, but that such high-handed and impudent attempts at swindling may, as far as possible, be prevented in future.

The order of the court, therefore, will be that the bankrupts stand committed to jail until they shall account for the goods thus traced into their hands.

On petition to Judge Drummond for a writ of habeas corpus this ruling was affirmed. See [Case No. 12,254.]