### In re ROSSER.

(District Court, E. D. Missouri, E. D.    August 26, 1899.)

BANKRUPTCY—REFUSAL TO TURN OVER ASSETS.

> A bankrupt who admits that he had in his possession $2,500 in cash, three or four weeks before proceedings in bankruptcy were begun against him, and who refuses, when an order is made upon him, to turn it over to the trustee, or to give any account of what disposition he has made of it, should be committed to prison until he disgorges the same.

(Syllabus by the Court.)

In Bankruptcy.

On April 7, 1899, an involuntary petition in bankruptcy was filed in this court against George P. Rosser, and on May 11th following he was adjudicated a bankrupt.   On June 5th thereafter one Frederick E. Neeper was appointed his trustee in bankruptcy, and, having duly qualified, was, at the commencement of these proceedings, acting as such.   At the relation of said trustee, Sidney J. Roy, referee in bankruptcy of this court, cited said bankrupt to appear before him at Hannibal, Mo., on the 23d day of June, 1899, to submit to an examination in accordance with the ninth paragraph of the seventh section of the act of July 1, 1898, commonly called the "Bankrupt Act."   Rosser appeared, and, among other things, testified that on the 17th day of March,

1899, he mortgaged certain real estate for the sum of $2,500 to one Logan, and he refused to tell what had become the money, or to give any account thereof. Thereupon the referee in bankruptcy made an order requiring him to pay over the money to the trustee, which he refused to do, and the referee entered an order declaring him in contempt of court, and certified the matter to this court for its opinion and action. The other material facts will sufficiently appear in the opinion.

B. A. Jamison, for trustee.

P. H. Cullen and J. D. Hostetter, for bankrupt.

ROGERS, District Judge (after stating the facts as above). Accompanying the certificate of this case to this court, the referee sent up the testimony of Rosser and that of various other witnesses, who were examined on the 23d and 24th days of June, 1899, and also the schedules as filed by the said Rosser. From these schedules and the testimony of said Rosser the following facts appeared: Rosser began the general merchandise business at Center, Ralls county, Mo., in the month of June, 1898. It is not made to appear from the testimony that at the time he entered the business he was in debt. On the contrary, it appears that he had a cash capital of about $2,000, a portion of which was in bank. He first bought out a small stock of goods, and then began making small purchases, but later made large purchases of various merchants in different cities, chiefly in the city of St. Louis. During the months of January and February, 1899, large quantities of these goods purchased were delivered. Early in March following, and before the bills for these large quantities of goods had matured, Rosser began negotiating a trade of his entire stock of goods and merchandise to one Briscoe for a house and lot in said town of Center, and a 120-acre tract of land situate near thereto. The negotiations were pending about 12 days, and on the 16th of March the trade was consummated. Immediately before the trade was consummated, an invoice of the goods on hand was taken, showing something about $3,600 of stock on hand. Of this stock $3,000, as invoiced, was turned over to Briscoe for the realty aforesaid, and the remainder of the stock was sold in job lots to confidential friends, former employés, and near relatives. The persons to whom these job lots of goods were sold were creditors of Rosser, and, notwithstanding that fact, paid cash for the goods which they bought. The 120-acre tract of land which Briscoe conveyed to him in part payment for the goods was mortgaged at that time for nearly its full value, and the mortgage due. The house and lot were unincumbered, and worth about $1,400. Pending the negotiations for this trade between Briscoe and himself, Rosser, with the assistance of his attorney, was negotiating a loan upon the land and house and lot above referred to. The deed from Briscoe to the bankrupt for the house and lot and land was executed on the 16th of March, and on the day following a man by the name of Logan, with whom Rosser's attorney had been negotiating for a loan, advanced to Rosser $2,500 on the land and house and lot, and took a mortgage to secure the same, which matured in six months. The deeds from Briscoe to Rosser, and the mortgage from Rosser to Logan, were recorded about the same time,—possibly on the same day,—so that the negotiations for the sale of the mer-

chandise and the mortgage of the property to be received therefor were being conducted at one and the same time, and, presumably, with the knowledge of all of the parties. Not one cent of the proceeds of the sale of his stock of goods, wares, and merchandise, nor of the proceeds of the mortgage of $2,500, was appropriated to the payment of his creditors. As stated, when he engaged in business, he was not in debt; had capital amounting to not less than $2,000,— possibly more. When he consummated the trade above referred to, nine months after he began business, his mercantile debts amounted to about $5,400, and, including the mortgage on the land, there were other debts amounting in the aggregate to about $4,500; in other words, he was indebted, when he quit business, in about the sum of $10,000. Among his assets is the 120-acre tract of land covered by two mortgages for a larger amount than the value of the land and the house and lot. His other assets are purely nominal. His condition may be summed up as follows: His $2,000 was gone, the merchandise he had was gone, his assets were nominal, and he owed $10,000 in money. By his own testimony he showed that about two-thirds of the goods he had bought were paid for in cash, and his outstanding accounts are so small as to show that his collections must have been excellent. Upon being interrogated before the referee as to what he had done with the $2,500 for which he had mortgaged the real estate, he declined to answer, upon the ground he could not answer the question without incriminating himself, and yet, in his testimony, he says that he had not, at that time, committed any crime. After a thorough and searching investigation, no information was furnished by the bankrupt as to what he had done either with the money he had received on the mortgage or with the money for which he had sold the goods. He claimed to have come to St. Louis immediately after getting the money on the mortgage, and to have remained here a short while, and seeks to leave the impression that he was dissipating, and, probably, gambling, but does not positively so state, but does say that when he returned he did not have the money, and declines to give any disposition he had made of it whatever. Upon appearing in this court he first filed an answer, in which he asked for time to produce testimony to show that he was unable to comply with the order of the referee in bankruptcy requiring him to pay over the $2,500, and also stated his inability to do so. This answer was not under oath. It was accompanied, however, by an affidavit of one of his attorneys, in the nature of a complaint, that the referee had not allowed him to be present when other witnesses were examined, and that the referee would not allow his counsel to cross-examine him. The court thereupon made an order permitting him to be cross-examined, and set the case down, on motion of his counsel, for hearing on the following day. At the hearing he declined to be cross-examined, and filed an answer, in substance to the effect that he had disposed of this $2,500 before the proceedings in bankruptcy were instituted against him, and that he was wholly without the power to pay the money, because he did not have it, and had no way of raising it. He makes no disclosure whatever as to how he disposed of it, to whom he disposed of it, what he disposed of it for, or anything about

it, beyond what has been stated. The petition of the trustee, heretofore filed, is now pending to commit him for contempt for not obeying the order of the referee to turn over the money.

I have carefully read over all the testimony, and carefully considered the questions involved, because of its important bearing, not only upon the rights of the bankrupt, but as it may affect the general administration of the bankrupt law. The ninth paragraph of section 7 of the bankrupt law provides that the bankrupt shall, "when present at the first meeting of his creditors, and at such other times as the court shall order, submit to an examination concerning the conduct of his business, the cause of his bankruptcy, his dealings with his creditors and other persons, the amount, kind and whereabouts of his property, and, in addition, all matters which may affect the administration and settlement of his estate"; and section 41 provides that "a person shall not, in proceedings before a referee, disobey or resist any lawful order, process, writ," etc.; and in paragraph b of that section it is provided "that the referee shall certify the facts to the judge, if any person shall do any of the things forbidden in the section. The judge shall thereupon, in a summary manner, hear evidence as to the acts complained of, and if it is such as to warrant him in so doing, punish such person in the same manner and to the same extent as for a contempt committed before the court of bankruptcy, or commit such person upon the same conditions as if the doing of the forbidden act had occurred with reference to the process of, or in the presence of, the court." The question, therefore, arises whether the order made by the referee was a lawful order, within the meaning of section 41 of the bankrupt act. The present bankrupt law is new, and there are very few adjudications. A good deal of light, however, is thrown upon this subject by decisions under the English bankrupt law, as well as under the former bankrupt laws of this country. A case strikingly in point with this (in which the cases are reviewed) is the case of In re Salkey, 21 Fed. Cas. 235 (No. 12,253), in which Judge Blodgett said:

"The bankrupts in this case occupy substantially the attitude of saying to the court: 'We have had in our possession assets to the value of over $20,000 between January and October, 1873, and refuse to give any account thereof. We have not turned them over to our assignee. We do not admit we have them in our possession. The court and creditors must help themselves; do the best you can. We stand mute, and refuse to throw any light upon the subject of the disposition of this large amount of funds.'"

That statement is no stronger than the facts in this case. Between June, 1898, and March, 1899, this defendant had in his possession many thousands of dollars' worth of goods. He had capital, when he entered business, of $2,000. He quit business with the $2,000 gone, $10,000 in debt, $5,400 contracted for merchandise bought, and in about one month before he was adjudicated a bankrupt he had in his possession $2,500 in cash, raised by mortgage, and several hundred dollars in cash, the proceeds of the sale of the goods. He says:

"I have paid no debts. I have no goods. I disposed of the $2,500 in money. My book accounts are practically worthless, and nominal in amount. My

other assets amount to very little. I decline to give any account of what I have done with the money I have received on this mortgage, and I have not turned over to the trustee that which I received for goods. Now, do the best you can. I decline to give any account of what I did with it."

In the case of In re Salkey, supra, Judge Blodgett said:

"Is the court to sit tamely by, and be baffled by such acts of practical contumacy on the part of a bankrupt? Perhaps no more forcible illustration of the necessity of the exercise of the powers specifically granted to the English bankrupt court, and, as I have claimed, impliedly granted to the bankrupt courts under our law, could be imagined than the case before us. Here the bankrupts admit that between the 1st of January, 1873, and the time that proceedings in bankruptcy were commenced against them, they had merchandise and property in their possession which they had purchased on credit, and not paid for, to the value of over $35,000. They refuse to explain what has become of that property. They offer no hypothesis to account for its disappearance, but simply say, in response to the final order for accounting, that they have no further account to give. Can it be said that any reasonable mind should be satisfied with such an accounting by a bankrupt for his assets? Can it be said that a court charged with the administration of the estate of a bankrupt, and bound to see that all the estate goes to the assignee for the benefit of creditors, is to be satisfied, on such a showing, that the bankrupts have honestly turned over to the officers of the court all their assets? Ought the court to be put off with mere silence, or refusal or neglect to account in a reasonable manner for assets traced clearly to and admitted by the bankrupts themselves to have been in their hands and under their control at so recent a date? The administration of bankrupt estates is, in the main, unsatisfactory at best; but how much more must it be if there is no power to unearth concealed assets, and compel bankrupts to disgorge their hidden property. The duty of the bankrupt is to honestly account for his assets according to facts. He may have lost his property by unfortunate speculations, or by gambling, even, so that it is beyond his reach or that of his assignees, and a true statement of the facts would be an accounting for it. That is a showing of what has become of it, within the intention of the law; but until some explanation is made the court must hold the bankrupt accountable. If, upon such examination, it is made to appear to the satisfaction of the court that a bankrupt has assets secreted which he has not delivered to his assignee, surely it could not be expected that the court should be content with the mere barren results of the information which the examination should give; but the court clearly has the power to enforce the surrender of the property, if it appears to the satisfaction of the court that it is still in the control of the bankrupts themselves, or no disclosure is made to show that any other person has possession of it. The conclusion is inevitable, from the admissions of the bankrupts in the examinations, that they still have the possession, in some manner, of those goods or their proceeds, or they have information or knowledge as to where those goods or proceeds can be found, and fraudulently withhold such information."

If this language had been used with reference to the case at bar it must be conceded it could not have been more apposite. In this connection, see the Case of Purvine, reported in the National Bankruptcy News, June 15, 1899, No. 14, p. 326, decided by United States District Judge Edward R. Meeks. In both cases cited the parties were committed until they disgorged the assets in their possession.

If any case was ever presented to a court of justice which disclosed a more deliberate and corrupt scheme on the part of a bankrupt to swindle his creditors than the one at bar, I have not met with it. The story he tells of what he did after getting the money is so evasive, unreasonable, and incredible as to produce but one effect,—that of utterly destroying the credibility of the bankrupt. Indeed, his whole evidence covering the period in which he was in business shows

a degree of recklessness, want of probity, and dishonesty rarely exhibited in courts of justice. If the bankrupt law is to be administered so as to permit a man, by deliberate dishonesty, to dissipate his assets in the way the defendant is shown to have made away with his, and escape responsibility by perjury, and thereby swindle his creditors, the bankruptcy court must inevitably become a harbor of refuge for rascals; and honest men, who have been unfortunate in business, and for whose benefit the law was enacted, will hesitate to accept its beneficent provisions, because a discharge in bankruptcy will become a badge of vice and crime. Either one of two things is true in this case,—this mortgage upon which he claims to have raised $2,500 is a sham, intended for the purpose of enabling him to appropriate the land in question ultimately to his own use, or else he got the $2,500. If he got the $2,500, he has it now, or he has invested it in something else, or he has deposited it somewhere with some one, to be held in trust for him. He does not deny having invested it in other property, nor does he attempt to account for it, so that it may be, while he has not the money itself, he has that which represents it; and, in the judgment of the court, either the money or that which represents it is still under his control. notwithstanding his answer. It cannot be assumed that a man who has practiced such rascality as this has done it for the purpose of giving away the money, and he is unwilling, under oath, to state that he has either gambled it away, or that he has lost it in dissipation and vice. He has sworn, and other witnesses have sworn, that he received the money,—among others, his attorney, and Logan, who loaned him the money; and Logan has sworn that it was never returned to him, and, indeed, denies any collusive conduct between himself and the bankrupt as to the mortgage on the property. The court must therefore assume that it is true that the bankrupt got the $2,500 in cash. He has so testified himself, and, having made his bed by saying he got it, he must now lie upon it, or produce the money. In the language of Judge Blodgett, it seems to me that the court ought not to allow itself and the creditors of this man to be mocked in this way. It ought to compel him to account for this money, or, if he has invested it otherwise, to make it known, and turn over whatever he has invested it in to the trustee, to the end that justice may not only be done to the creditors of the bankrupt, but that such high-handed and impudent attempts at swindling may, as far as possible, be prevented in the future. The order of the court, therefore, will be that the bankrupt stand committed to jail until he shall account for and surrender to the trustee the $2,500, the proceeds of the mortgage, which he received on the 17th day of March, 1899.