### In re SHACHTER.

#### (District Court, N. D. Georgia. December 8, 1902.)

1. BANKRUPTCY—FAILURE OF BANKRUPT TO SURRENDER PROPERTY—CONTEMPT—EVIDENCE.

On a rule for contempt against a bankrupt for failure to deliver all of his property to the trustee, evidence reviewed, and *held* to justify a finding that he had unlawfully retained goods of the value of $1,063.94, which he should be required to surrender.

2. SAME—JURISDICTION.

A federal district court, sitting as a court of bankruptcy, has jurisdiction to proceed against a bankrupt for contempt, where he has failed to turn over all of his property to the trustee.

In Bankruptcy. Rule for contempt.

Mayson, Hill & McGill, for movants.
Slaton & Phillips, for bankrupt.

NEWMAN, District Judge. This is a rule for contempt against Joseph Shachter, against whom a petition in involuntary bankruptcy was filed on September 16, 1902, and who was subsequently, on October 7th, adjudged a bankrupt. This rule for contempt was filed on September 17th, the next day after the petition in bankruptcy was filed, and after the receiver was appointed to take charge of the stock of goods of the bankrupt. The substance of the petition against the bankrupt, now under consideration, and of certain amendments filed thereto, is that the bankrupt had possession or control of a considerable amount of merchandise and cash, which he was secreting, and had failed to turn over to the receiver. The bankrupt appeared in response to the rule, and was represented by counsel. A considerable amount of evidence was offered by the petitioning creditors who brought the rule, and the bankrupt testified at considerable length in his own behalf. While the testimony of a brother of the bankrupt, Philip Shachter, was being taken, it developed that a considerable amount of money had been deposited in the Fourth National Bank of Atlanta in the name of Philip Shachter, which had been given to Philip by the bankrupt, $100 of it on the day the petition in bankruptcy

was filed, $500 on September 12th, and $825 on September 13th. All of this money had been quite recently withdrawn from the Fourth National Bank, and, after Philip Shachter on the stand had made several contradictory statements about the matter, it finally resulted that the wife of the bankrupt, who was in court, produced and gave to the clerk of the court, through the bankrupt's counsel, $895 in currency which she had on her person, and which it was conceded was a part of the money given by the bankrupt to Philip Shachter, and by Philip Shachter deposited in the Fourth National Bank in his name, and subsequently withdrawn. Philip Shachter produced while on the stand a check for $500 given by one Philip Elson, on the Fourth National Bank, for $500, which he stated also represented a part of the money so withdrawn. This check was cashed by the clerk by consent of counsel, and this amount of $500, together with the $895, subsequently turned over to the receiver in this case. Thirty dollars, therefore, of the $1,425 was unaccounted for, and had been used in some way after it was withdrawn from the bank.

The claim for the petitioning creditors is that the bankrupt had quite recently, during the month of August and in September prior to the filing of the petition in bankruptcy, bought a large amount of new goods, and that at the time the petition in bankruptcy was filed a very considerable amount of this new stock was not in the store, although it had so recently been delivered there. The evidence shows that the bankrupt had recently purchased $7,807.94 worth of new goods, all of which goods were delivered in the store from the 19th of August up to the day before the petition in bankruptcy was filed. One bill, amounting to $215, was delivered at the store August 19th, and one, amounting to $291, was delivered on August 23d. All the other new goods purchased were delivered subsequent to August 24th.

For the purpose of being used on the hearing of this rule, the receiver was directed to have an inventory made of the stock of goods on hand when the receiver was appointed. The goods on hand were valued by the appraisers at $2,750, and there was an additional amount for fixtures. It is claimed that neither the amount allowed for goods nor for fixtures represented the costs; but it is immaterial about this, in the view I have taken of the matter. It may be assumed for present purposes that the bankrupt had sold none of his old stock whatever from the time he began to receive new goods up to the time the receiver was appointed and took charge. If he had sold any of the old stock which he had on hand when he began to receive the new goods, it would simply operate against him, and make him account for more cash than I shall hold him responsible for.

The bankrupt had bought, as stated, $7,807.94 of new goods, which had been delivered, as shown by the railroad receipts, to his store, and had become a part of his stock. Several invoices of goods were either in the depots in Atlanta when the receiver was appointed or were delivered afterwards, and have been since either stopped in transit or turned back by the court to the sellers, upon the ground that it was clearly a case in which no title had passed, under the circumstances of the case, to the bankrupt. Persons familiar with the bankrupt's stock, especially one gentleman who had worked for the bankrupt in

May and June, were questioned as to the amount of new goods in the store at the time the inventory was taken. The highest amount placed on the new goods in the store by any one was $300 or $400, the gentleman most familiar with the stock putting it at much less than this amount. For the purpose of dealing with the utmost fairness with the bankrupt in this proceeding, I shall assume that there were $500 worth of new goods in the store at the time the receiver took charge, although there is no reliable evidence whatever in the record from which to conclude that it amounted to over $400.

The bankrupt took the stand in his own behalf, and undertook to account for the disappearance of these new goods in so short a period, and his explanation was this: He said he had sold, and he read from a slip of paper which he held in his hand the names of parties to whom he had sold, goods which cost in the aggregate $4,344, and from which he had received $2,059 in cash, and $574 was still due him by persons to whom he sold the goods. A calculation shows that the goods were sold, according to his own statement, for 29 per cent. below cost. The goods were sold, according to the statement of the bankrupt, in lots to peddlers, whom he named, as follows: Bressler, Constangy, Feldman, Niesbaum, Lavigne, P. Stein, Yallowitz, Bloomberg, Gritzman, P. Ruse, Zadick, Morris, A. Feller, John Robinson, Beaman, and Sinkovitz. The bankrupt in his evidence said that he did very little business during July and August, except what he sold at wholesale. He says: "Some days I didn't take in two dollars. The most of it I sold at wholesale to peddlers." But his counsel claim that he ought to be allowed for goods sold in the ordinary course of business in the store, $1,500, from which they say he would have realized $1,197. How this calculation is made does not appear in any way, and, so far as I can see, it is not supported by the evidence; but I shall give him the benefit of it for the purpose of disposing of this rule. This $1,500 will be added, therefore, to the $4,344, making $5,844.

The bankrupt claims that he had shipped $400 worth of these new goods at cost price to his brother I. M. Shachter, in Jersey City, N. J., to pay on an indebtedness to his brother. Allowing him the benefit of this very doubtful transaction, it would increase the amount of these new goods accounted for to $6,244. Assuming that in the stock turned over to the receiver there was new goods amounting at cost price to $500, this would make an aggregate of $6,744, and this is allowing the bankrupt everything he claims as to goods sold and shipped out in lots, his counsel's own estimate as to the amount sold in regular trade, and a very liberal estimate for new goods on hand. The balance unaccounted, therefore, of the goods received in the store within a few weeks before the bankruptcy proceedings were instituted, is $1,063.94.

Of course, this conduct of the bankrupt in selling the new stock of goods received in his store, in the way he did, is very remarkable. For instance, he sold to his brother-in-law, Bressler, $600 worth of goods for $400, just a few days before the petition in bankruptcy was filed. He owed one Constangy, he says, $450, which he got from him in August, and he gave him $685 worth of goods for that the 1st of September. He says:

"I sold a fellow by the name of Felman, a peddler here in Atlanta, $150 worth, and I got $125 in cash for it. I sold a fellow by the name of Niesbaum, on Decatur street, $250 worth. He sells blankets and skirts. I got $200 cash for that. I sold a fellow by the name of Lavigne $145 worth, and he gave me $100 in cash."

His testimony is a little uncertain, but he seems to have sold a man named P. Stein $460 worth of goods for $300 cash. He says:

"I sold a fellow named L. Yallowitz who lives in Abbeville, S. C., and peddles around, $265 worth for $165. He was here about two weeks ago. I sold a fellow named J. Bloomberg $316 worth, and I got $200 for it. I sold a fellow named Gritzman $389 worth, and he paid me $115. I sold them for less than cost. I sold a fellow named P. Russ, who peddles here in town, $290 worth of goods for $155."

He says he sold two fellows named Zadick $165 worth for $115.

These sales were all probably of new goods which had been in his stock but a few days at the time of the sale. There was no evidence, however, to controvert his statement, and he has been given, as stated, the full benefit of his evidence as to the disposition of these goods.

It is claimed by counsel for the movants in this rule that the bankrupt has cash which he has failed to turn over to the receiver, and a calculation is made by which it is sought to be demonstrated that this is true. I have gone with great care over the figures made by counsel for both sides, and over the bank book, checks, etc., and have made some calculations of my own, but I am unable to see from all this that the bankrupt necessarily has any cash in his possession. No books were kept by the bankrupt such as would throw any light on the question. It appears from a comparison of his bank book with the checks which have been produced, and which I have before me, that many checks are missing. What those checks were for it is impossible to say, or what became of the considerable amount of money the bankrupt received during the latter part of August and the half of September covered by this investigation. In addition to the amount of cash received by the bankrupt from the sale of goods in lots to peddlers, and the amount received in regular and ordinary sales from day to day, and any amount he may have had on hand in cash at any period from which a computation would commence, he received $3,000 in cash just before the bankruptcy proceeding was instituted, from the sale of a house and lot. The only cash which the evidence shows to my entire satisfaction that the bankrupt had in possession at the time the receiver was appointed is that which has been already paid into court.

My conclusion is that the bankrupt has in his possession and control, and which he has failed to turn over to the receiver, goods of the value of $1,063.94, which he should be required now to turn over to the trustee in bankruptcy.

Upon the question of this being a proper case for proceeding against the bankrupt as for contempt, counsel for the bankrupt in this case rely upon the recent case of Boyd v. Glucklich, 8 Am. Bankr. R. 393, 116 Fed. 131, decided by the circuit court of appeals for the Eighth circuit, and especially upon the reasoning of Circuit Judge Caldwell for the majority of the court. I have examined that case carefully, and find nothing whatever, even in Judge Caldwell's opinion, which denies the right of the court, in a proper case, to proceed as for contempt

against a bankrupt who wrongfully refuses to turn over assets to a receiver or to a trustee in bankruptcy. A majority of the court seem to have commented upon the fact that insufficient notice was given, and that the proceedings were summary to an extent not justified by the circumstances. Circuit Judge Sanborn in a concurring opinion says:

"I concur in the order reversing the orders below, because the evidence in the record satisfies my mind, beyond a reasonable doubt, that the bankrupt had in his possession or under his control at the time the order of the referee was made a much larger amount of property that belonged to his estate in bankruptcy than the amount which the court finally ordered him to surrender to the trustee. The rule by which this issue is to be determined is that the property of the bankrupt estate traced to the recent possession or control of the bankrupt is presumed to remain there until he satisfactorily accounts to the court for its disposition or disappearance. He cannot escape an order for its surrender by simply adding perjury to fraudulent concealment or misappropriation. It is still the duty of the referee and of the court, notwithstanding his oath and testimony, if satisfied beyond a reasonable doubt that he has property of the estate in his possession or under his control, to order him to surrender it to the trustee, and to enforce that order by confinement as for contempt. These rules are established and illustrated by the following cases: In re Salkey, 21 Fed. Cas. 235, 238–240 (Nos. 12,253, 12,254); In re Schlesinger, 4 Am. Bankr. R. 361, 42 C. C. A. 207, 208, 102 Fed. 117; Id. (D. C.) 3 Am. Bankr. R. 342, 97 Fed. 930, 932; In re Deuell (D. C.) 4 Am. Bankr. R. 60, 100 Fed. 633, 634; In re Greenberg (D. C.) 5 Am. Bankr. R. 840, 106 Fed. 496; In re McCormick (D. C.) 3 Am. Bankr. R. 340, 97 Fed. 566, 567; In re Mayer (D. C.) 3 Am. Bankr. R. 533, 98 Fed. 839, 841."

These views of Judge Sanborn are in accordance with the views of a majority of the circuit court of appeals for this circuit, as stated in Re Purvine, 37 C. C. A. 446, 96 Fed. 192, and also in the cases cited by Judge Sanborn and set out in his opinion as quoted above. See, as probably controlling on this question, Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405.

In the case now under consideration, the bankrupt was given the fullest opportunity to be heard and to account for the disposition of his stock of goods. The petition was regularly filed against him, he was served, appeared by counsel and answered the rule, and had all the time he desired to present his side of the case. The case was postponed from time to time by the court in order to get a full hearing and accommodate counsel, as well as for the convenience of the court. Since the hearing was concluded counsel on both sides have been given full opportunity to present briefs and calculations. The court has had the matter under advisement for some time, and the conclusion above reached is after the fullest consideration of the case and of the evidence submitted. The present case measures up exactly to the rule stated by Judge Sanborn, as follows:

"The rule by which this issue is to be determined is that the property of the bankrupt estate traced to the recent possession or control of the bankrupt is presumed to remain there until he satisfactorily accounts to the court for its disposition or disappearance."

Making every possible allowance here in favor of the bankrupt, goods of the value above stated are wholly and entirely unaccounted for, and went into the possession of the bankrupt, some of them within a very few days, and all of them within three or four weeks, before the

receiver took charge and their absence was discovered. The fact that the bankrupt denies having the goods in his possession or control certainly cannot be conclusive, when the circumstances are overwhelming to the contrary. If so, the court would be powerless, in the face of the bankrupt's oath, to require the production of property, however conclusive might be the evidence that such property was in his possession or control.

An order may be taken in accordance with what is herein stated.