In re DE GOTTARDI et al.

(District Court, S. D. California. February 20, 1902.)

No. 1,547.

1. BANKRUPTCY—JURISDICTION OF COURT—COMPELLING PRODUCTION OF ASSETS.

A court of bankruptcy has jurisdiction, on issues properly joined, to determine whether or not a bankrupt has in his possession or under his control money or other property belonging to his estate in bankruptcy, and, if the issues be found against him, to make an order requiring him to pay or deliver such money or property to his trustee and to force obedience to such an order by commitment as for contempt.

2. SAME—COMMITMENT FOR CONTEMPT—PROCEDURE.

In proceedings for the enforcement of such an order two rules are to be observed: First, that the answer of respondent to the rule to show cause is not conclusive, but traversable; and, second, that the power of commitment should be cautiously exercised, and only when its propriety is beyond reasonable doubt.

3. SAME—HEARINGS BEFORE REFEREE—EVIDENCE.

Upon an issue before a referee as to the truth or falsity of a claim made by bankrupts that their store was entered by burglars on a certain night, shortly before their bankruptcy, and a large amount of money was taken from their safe, it was not error to admit the testimony of witnesses that they saw no strangers or suspicious characters in the small town where the store was situated on the day preceding the alleged burglary, although such testimony is entitled to little weight.

4. SAME.

Various rulings of a referee upon the hearing of a petition by a trustee to compel bankrupts to turn over money alleged to be in their possession or under their control considered, and *held* erroneous, as admitting testimony which was incompetent as hearsay or as the opinions or conclusions of the witnesses.

5. SAME—PRACTICE ON HEARING BEFORE REFEREE—REVIEW.

A hearing before a referee, under Bankr. Act 1898, is in the nature of a hearing in equity, and is governed by the rules of equity practice of the federal courts, both as to the hearing itself and as to the review by the judge. Orders in bankruptcy No. 22, providing that "the examination of witnesses before the referee may be conducted by the party in person or by his counsel or attorney, and the witnesses shall be subject to examination and cross-examination, which shall be had in conformity with the mode now adopted in courts of law," is substantially copied from equity rule 67, and it does not have the effect, in connection with Rev. St. § 721, of rendering such hearings and proceedings for review subject to the laws of the state governing trials and appellate procedure in actions at law, but, on the contrary, indicates the practice as that prescribed by the rules in equity. Applying such rules, it is the duty of a referee, although he must pass on objections to testimony, to cause all testimony excluded to be taken down and made a part of the record, with the ruling and exceptions noted; and upon a review the judge is not required to reverse the decision because of the erroneous admission or exclusion of evidence, but it is his duty to determine the issues de novo upon the competent evidence in the record, or he may recommit the case for further hearing as the circumstances may require.

**6. SAME—TESTIMONY OF BANKRUPT—CONSIDERATIONS AFFECTING CREDIBILITY.**

Where bankrupt partners, on their examination, by pre-arrangement with their counsel, refused to answer a large number of competent and material questions with reference to their property and business, such as the capital they had when they established the business, whether they took inventories, etc., in effect refusing to give any information respecting their affairs, on the ground that their answers might tend to incriminate them, reading their refusal and the grounds from a slip of paper given them by their counsel, such action showed a disposition not to be fair and candid with their creditors, and a purpose to conceal their transactions, which may properly be taken into consideration in determining the weight to be given to their testimony in subsequent proceedings to compel them to turn over money and property which they are alleged to have concealed.

**7. SAME—FAILURE OF BANKRUPT TO ACCOUNT FOR PROPERTY—BURDEN OF PROOF.**

Where a bankrupt admits having had money or property a short time before his bankruptcy, which is not shown by his schedules, it is incumbent upon him to clearly account for the same to the satisfaction of the court; otherwise, he must be held to still have it in his possession, and to be able to turn it over to his trustee.

**8. SAME—EVIDENCE CONSIDERED.**

The assets of a bankrupt partnership were shown to have decreased several thousand dollars within three months prior to the bankruptcy, without any apparent business reason therefor. On the examination of the partners they refused to answer questions with reference thereto. but in a proceeding by the trustee against them to compel them to turn over to him certain sums of money. aggregating about $14,000, alleged to be in their possession or under their control, they testified that a short time before the bankruptcy burglars had entered their store and taken $7,500 in cash from the safe. One of the partners, who was shown to have drawn $6,500 out of the business, accounted for the same by testifying that he had paid $6,000 of it to a woman with whom he got into a "scrape," and $425 to a doctor in connection with the same; but he refused to give the name of either the woman or the doctor. There was no evidence to corroborate such testimony; but, on the contrary, circumstances tended to discredit it, and to show a purpose on their part to defraud their creditors. At the time of the alleged burglary their accounts in the banks with which they did business were. and had been for some time, largely overdrawn, and they had been asked to make the deficit good; also, a few days later, when threatened with attachments by the banks, they turned over to an attorney drafts amounting to over $2,700,—a part in alleged payment for past services which could not be explained, and $2,000 of it as a retainer for services to be rendered in connection with the capture and conviction of the burglars. *Held*, that the testimony of the bankrupts was an admission that they had the sums of money at the times stated, but was wholly insufficient to account for the same satisfactorily, in view of the discredit cast upon it by the circumstances and by their past conduct, and that a finding by the referee that the alleged burglary and the payment to the woman were fictitious, and his order requiring the bankrupts to turn over the money to their trustee was fully justified, and such order would be enforced.

**9. SAME—SCOPE OF HEARING—COLLATERAL QUESTIONS AFFECTING CREDIBILITY OF BANKRUPTS.**

In a proceeding by a trustee against bankrupts to compel them to turn over to him certain sums of money alleged to be in their possession, where the principal issues are whether an alleged burglary and payment of money, by which the bankrupts attempted to account for such sums, were real or fictitious, and parts of a scheme to defraud creditors, the question of the good faith of a transaction occurring about the same time, by which they transferred a large sum to their attorney, is per-

tinent to said issues, and one which the court of bankruptcy has power to investigate, notwithstanding a prior consent order made by a referee requiring the attorney to turn over the money so received to the trustee, but reciting that it was not based upon any finding of fraud, and the compliance of the attorney with such order.

In Bankruptcy. On review of order of referee requiring the bankrupts to turn over to the trustee certain sums of money found to be in their possession or under their control, and on a rule to show cause why they should not be adjudged in contempt for failure to obey such order.

Rothschild & Ach, for creditors.
Hunsaker & Britt, for bankrupts.

WELLBORN, District Judge. The creditors' petition in this matter, asking that the respondents be adjudged bankrupts, was filed May 18, and the adjudication had June 21, 1901. On September 3d next following, the trustee in bankruptcy and one of the creditors filed with the referee a petition alleging, in substance, that the bankrupts were wrongfully withholding from the trustee a large amount of assets not reported in their schedules, and charging specifically upon both the concealment of $7,500, and upon De Gottardi the concealment of $6,500, and asking an order requiring them to pay such assets to said trustee. The bankrupts made answer to said petition, denying, in the main, its allegations; and thereupon evidence was taken, and the findings and order now under review were made by the referee. Thus it will be seen that the proceeding before the referee was not an examination of the bankrupts and other witnesses for the purpose of acquiring information generally as to the bankrupts' estate, but was a hearing on specific issues duly raised by appropriate pleadings. To account for the two amounts of money which they were specifically charged with concealing, the bankrupts claimed that, within a few weeks prior to their bankruptcy, De Gottardi became involved in an intrigue with a woman, in consequence of which he paid to the woman $6,000, and to a doctor, for services in connection with the same matter, $425. They further claimed that on the night of the 30th of April, 1901, their store at Cayucos, Cal., was burglariously entered, and a large amount of money ($7,500 or $8,500) abstracted from their safe by the burglars. Both of these claims the trustee contested.

The findings and order of the referee were as follows:

"That from December, 1900, the bankrupts had been engaged in buying produce on commission for Loeb, Fleishman & Co., of Los Angeles, and others, and that until about April 24, 1901, it had been their practice to receive payments from Loeb, Fleishman & Co. through the mail, by checks of that firm, drawn on the Farmers' & Merchants' Bank of Los Angeles, which checks, until the last-named date, they had regularly deposited with their bankers in San Luis Obispo. On said April 24th they had overdrawn their accounts at two banks in San Luis Obispo, and on the same day they requested Loeb, Fleishman & Co. to send them $5,000 in coin by express, which that firm declined to do. Loeb, Fleishman & Co., in answer to the request of the bankrupts for coin by express, said they would send them checks for all they owed, but would not send coin, and that if they wanted coin they must come and get it. Within 25 days before that time (April 24th) the bankrupt De Gottardi had drawn out of the firm $6,500. Three days afterwards (April

27th) **De Gottardi**, one of the bankrupts, left **Cayucos**, taking with him a check of Loeb, Fleishman & Co., payable to the order of De Gottardi & Righetti, for $3,375.10. He arrived that night at San Luis Obispo, stopping at the French Hotel, and early next morning (April 28th) left for Los Angeles. He remained in Los Angeles Sunday, and on Monday forenoon, the 29th of April, obtained the coin on the Loeb, Fleishman & Co.'s check, and also the cash on another check, dated April 29, 1901, for $2,628.91, making in all $6,004. This money he claims to have put in his satchel or dress suit valise, and with it left Los Angeles for Cayucos on the afternoon of the same day. He arrived at San Luis Obispo that night, and took a room at the Commercial Hotel, where he slept. He left San Luis Obispo early in the morning of the 30th of April for Cayucos, without calling on his bankers, loitered on the road, and arrived at Cayucos about 2 or 3 o'clock p. m. of the same day. He also claims to have taken the six thousand and odd dollars to his home at that place. No one saw the money after he obtained it, so far as the evidence discloses, except his wife. He also claims to have taken this money, and an additional $1,500 which he asserted he had had at his home since the latter part of March, to the store of the firm at Cayucos, and placed the whole amount in the safe, and left it there; that on the night of April 30th some person or persons effected a violent entry into the store and robbed them of the money. In fact, the evidence shows that the amount alleged to have been stolen was eighty-five or eighty-six hundred dollars. It also appears that the bankrupt De Gottardi drew out from the funds of the firm of De Gottardi & Righetti, in cash, the following sums: On March 21st, $3,000; on April 11th, $2,000; and on April 16th, $1,500; making the $6,500 hereinbefore mentioned. De Gottardi says that $6,000 of this money he paid to a woman with whom he got into a scrape, and $425 to a doctor for services rendered said woman in connection with said scrape, but he does not account for the remaining $75 of the $6,500 already mentioned. It will be seen that the said bankrupts have attempted to account for the money brought from Los Angeles, and the $1,500 that De Gottardi had at home, by the alleged burglary of the store on the night of April 30th, and for the $6,500 drawn by De Gottardi from the store by the alleged payment of the same to a woman and a doctor in settlement of De Gottardi's 'scrape.' These explanations, in the light of the evidence, are, to say the least, unsatisfactory. The firm of De Gottardi & Righetti were overdrawn at the Commercial Bank of San Luis Obispo on April 29th to the extent of about $3,000, and at the Andrews Banking Company, of San Luis Obispo, in the sum of nearly $1,500. They had been requested to at once settle these overdrafts, and it was then, in my judgment, they concocted the scheme of obtaining possession of large sums of money and defrauding their creditors. Shortly after these requests were made it appears that the firm must have had in its possession the following checks: Loeb, Fleishman & Co., on Farmers' & Merchants' Bank of Los Angeles, dated April 17, 1901, $3,375.10; Loeb, Fleishman & Co., on same bank, dated April 24, 1901, $2,658.18; and one of Hilmer & Bredhof, dated April 27, 1901, for $685.76. Neither of these checks was applied towards the payment of the overdrafts, yet on May 1st, the day after the alleged robbery, the last two named checks, aggregating $2,743.94, were given to Mr. F. A. Dorn in payment for alleged past services, $800, and the balance as a retainer in the matter of the alleged burglary. It appears further that no person other than the bankrupts were aware that the money brought from Los Angeles had been collected or placed in the safe. There are also a number of other suspicious circumstances tending to show that no burglary in fact was committed, which I deem unnecessary to detail.

"The bankrupt De Gottardi declined to answer certain questions propounded to him with the object of ascertaining the names of the woman and doctor to whom he claims he paid money, as well as the place of their respective residences. While De Gottardi's refusal to disclose the name of the woman might be commended in a social sense, as an act of gallantry, it cannot in law be excused. This denial being based on the ground that his answers might tend to incriminate him, it must be taken as a mere subterfuge, for the reason that, whether his meretricious relations with the

woman constituted a public crime or not, it could make no difference; for, if they did not, then this privilege of immunity from punishment would be useless and unnecessary, while, if the said relations made it a crime, the crime itself being admitted, the admission must be taken as a waiver of the constitutional privilege, and, the names and residences of the parties neither magnifying nor lessening the offense, this privilege would not avail, and therefore he could not shield himself from disclosing the facts sought by the questions asked. I am fully persuaded and satisfied, and therefore find, that no burglary was perpetrated, and that De Gottardi did not pay the moneys he asserts that he paid to the woman and doctor. I do further find that said bankrupts have now in their possession or under their control the sum of $7,500 in money and property of their estate, and that they have been and are concealing the same from their creditors and the said trustee in bankruptcy. And it is ordered that said bankrupts, Natele De Gottardi and David E. Righetti, do pay over and deliver to Edward Vollmer, the duly elected, qualified, and acting trustee of the estate of said bankrupts, within twenty-four hours after service hereof, the sum of $7,500 in money. I do further find that the sum of $6,500 drawn out as aforesaid by the said Natele De Gottardi from the funds of the firm of said De Gottardi & Righetti is now in his possession or under his control, and that the same is now being concealed by him from the creditors and the trustee aforesaid, less the sum of $1,500 claimed by De Gottardi to have been returned on April 30, 1901. Therefore it is ordered that said Natele De Gottardi do pay over and deliver to Edward Vollmer, the trustee aforesaid, within twenty-four hours after service hereof, the sum of $5,000 in money; the same being the property of the estate of said bankrupts.

"As to the other specifications set forth in the petition, I find that they have been satisfactorily explained. * * *"

The bankrupts failed to comply with said order, and thereupon, at the instance of the trustee, were cited to show cause why they should not be adjudged guilty of contempt. They have filed exceptions to said order, and, in response to said citation, have appeared and answered that said order was erroneously made, and is now under review, and, further, that they are wholly without means to pay over the amounts of money, or any part thereof, named in said order. Both of these matters—the review of the order and the rule to show cause—have been heard together, and, as they are closely connected, can be conveniently and without confusion considered in this opinion.

That a bankruptcy court has jurisdiction, on issues properly joined, to determine whether or not a bankrupt has in his possession or under his control money or other property belonging to his estate in bankruptcy, and, if the issues be found against the bankrupt, to make an order requiring him to pay or deliver to the trustee in bankruptcy the money or other property so found to be in his possession or under his control, and to enforce obedience to such an order by commitment as for contempt, are well-settled propositions. In re Rosser, 1 Nat. Bankr. N. 469, 96 Fed. 308; Id., on review in court of appeals, 41 C. C. A. 497, 101 Fed. 562; In re Purvine, 1 Nat. Bankr. N. 326, 37 C. C. A. 446, 96 Fed. 192; In re Salkey, 21 Fed. Cas. 235 (No. 12,253); In re Tudor, 1 Nat. Bankr. N. 476, 96 Fed. 942; In re Mayer, 98 Fed. 839; In re Tudor, 2 Nat. Bankr. N. 168, 100 Fed. 796; In re McCormick, 2 Nat. Bankr. N. 104, 99 Fed. 566; Knitting Works v. Schreiber, 2 Nat. Bankr. N. 899, 101 Fed 810, affirmed on review in 104 Fed. 1006; In re Deuell, 2 Nat. Bankr. N. 597, 100 Fed. 633; In re Schlesinger, 2 Nat. Bankr. N. 169, 97 Fed. 930; Id., on review, 3 Nat. Bankr. N. 177, 42 C. C. A. 207, 102 Fed. 117;

In re Miller, 3 Nat. Bankr. N. 329, 105 Fed. 57; In re Levin, 3 Nat. Bankr. N. 1011, 113 Fed. 498; Branden. Bankr. 332, 458. In the exercise of the jurisdiction above outlined, two rules—one relating to a matter of pleading, and the other to a matter of evidence—are to be observed: First. The answer of the respondents to a rule to show cause is not conclusive, but traversable. Knitting Works v. Schreiber (D. C.) 101 Fed. 810; In re Salkey, supra; In re Rosser, supra; In re Purvine, supra; In re Schlesinger, supra; In re McCormick, supra. Second. The power of commitment should be cautiously exercised, and only when its propriety is beyond reasonable doubt. In re Salkey, supra; In re Purvine, supra; In re McCormick, supra; Knitting Works v. Schreiber, supra.

The jurisdiction of the court being thus established, the matters next to be considered are the alleged errors and misconduct on account of which the bankrupts attack the referee's order. The only error specified in the petition for review is insufficiency of the evidence to justify the findings and order of the referee. Attorneys for the bankrupts, however, now contend in argument that errors were committed by the referee in the admission and exclusion of testimony; also that there was misconduct on the part of attorneys for the trustee, and that said errors and misconduct were gross, and require the setting aside of the referee's order, although, upon an inspection of the whole record, the judge should be satisfied that it contains enough competent evidence to justify the order.

General order in bankruptcy No. 27 is as follows:

"XXVII. Review by Judge. When a bankrupt, creditor, trustee, or other person shall desire a review by the judge of any order made by the referee, he shall file with the referee his petition therefor, setting out the error complained of; and the referee shall forthwith certify to the judge the question presented, a summary of the evidence relating thereto, and the finding and order of the referee thereon."

Ordinarily, I take it a review by the judge of an order made by the referee will be confined to the error pointed out in the petition for review. On account, however, of the peculiar nature of the pending proceeding, I have concluded to examine the grounds of error and misconduct—at least the salient ones—complained of in argument, as well as the one set out in the petition for review. To avoid repetition, I will state generally that objections and exceptions to all of the rulings complained of were duly made and taken, and, in order that the objections to testimony may be readily comprehended, will repeat what has already been made to appear, namely, that one of the main issues before the referee was whether the claim made by the bankrupts, in accounting for their assets, that on the night of the 30th of April, 1901, their store at Cayucos was entered by burglars and large sums of money abstracted therefrom, was true or false.

The ruling first complained of was the admission of the testimony of several witnesses to the effect that they saw no strangers or suspicious characters on the 30th of April, 1901, in the little town of Cayucos. While such testimony is entitled to but little consideration, I am not prepared to hold that it was incompetent.

The next ruling complained of was the admission of the testimony of William Hermann to the effect that Louis Padraita told him that on the 1st day of May, 1901, at the shop of Louis Padraita, in Cayucos, between the hours of 7 and 9 a. m., he met David E. Righetti in front of his (Righetti's) store; that he asked him why he did not go into the store; and that Righetti replied that he could not do so; that he didn't have any key, and was waiting for his clerk, Mr. Brockseib, to open the store. Previous to the admission of this testimony the trustee had introduced Louis Padraita as a witness, who testified, in substance, that he had no recollection of such conversation, but anything that he may have stated to Hermann was true. The testimony of Hermann, detailing statements made to him by Padraita, being hearsay, ought to have been rejected. It was incompetent for the purpose of impeachment, because, while Padraita probably did not testify as the trustee expected him to testify, still he had not, up to that time, given any damaging testimony against the trustee, and hence there was no reason for the trustee to attack his credibility. People v. Jacobs, 49 Cal. 384; Hickory v. U. S., 151 U. S. 303, 14 Sup. Ct. 334, 38 L. Ed. 170. Nor was the testimony of Hermann admissible because of the previous testimony of Padraita that anything he may have said to Hermann was true. Hermann's testimony was still hearsay, its effect being to get before the referee the naked declarations of Padraita as independent evidence. People v. Jacobs, supra. Nor was the testimony of Hermann admissible on the ground as further contended by counsel for the trustee, that the declaration of a conspirator is competent against a co-conspirator, for the reason that, up to the time Hermann testified, whatever may have been proven afterwards, there was no evidence that Padraita had conspired with the bankrupts to defraud the creditors of the latter.

The ruling next complained of relates to the testimony of John Tonini, who kept a saloon and lunch house on the road from San Luis Obispo to Cayucos, at which place De Gottardi stopped for about half an hour on the 30th of April, 1901. Tonini had testified that De Gottardi did not bring into the house with him a satchel, or anything of that sort; that he tied his team to the fence at a point where it could not be seen from the saloon. This evidence was in line with other evidence offered by the trustee of certain actions of De Gottardi on his return trip from Los Angeles,—leaving his grip in one car, and going into another for dinner, and into another to play cards, loitering the next day along the road to Cayucos, stopping at different places, where the grip was out of his sight or immediate control; the inference sought to be drawn from all of these actions being that he did not have a large amount of money in his grip. The witness was permitted to answer the following question: "He didn't impress you as being very anxious about what was going on out on the road, did he?" This question called for the opinion and conclusion of the witness, and was manifestly incompetent.

The next ruling complained of is the admission of certain testimony of E. C. Ivins, who was the sheriff of San Luis Obispo county, and on the 2d day of May went to Cayucos with writs of attach-

ment against De Gottardi & Righetti. This witness, sometimes in response to leading questions, was permitted to testify that the impression he gained from his conversations with De Gottardi was that the alleged robbery did not weigh heavily on the latter's mind, and that he did not want to talk about it, and, further, that he (Ivins) could find nothing to indicate that there had been a robbery, and that he reached the conclusion that De Gottardi and Righetti knew more about the alleged crime than they told him. The language of the referee in passing upon the objection was as follows: "The Court: He was the sheriff, and had conversations with Mr. De Gottardi, and viewed the premises. Objection overruled." This testimony was peculiarly objectionable. The issue being tried was whether the alleged robbery was a reality or a mere simulation,—a trick to account for assets which the bankrupts were concealing. The witness Ivins was then, and for two years prior thereto had been, sheriff of San Luis Obispo county,—presumably a man of high character, whose utterances commanded respect; and he was permitted to testify, substantially, that after conversations with the bankrupts, and an examination of the premises, his conclusion was that a robbery had not been committed, and that the bankrupts knew more about the alleged crime than they told him. How attorneys of experience and learning could urge or offer, as legal evidence, matters of pure opinion, so obviously and absolutely incompetent, I am at a loss to understand.

The next ruling of the referee complained of is of the same character as the one last mentioned, and relates to the testimony of Mr. A. M. Hardie, postmaster at Cayucos, with whom the bankrupts had often consulted on matters of business, and with whom they advised touching the alleged robbery and what they should do. Mr. Hardie testified to the conversation he had with the bankrupts. They were both together, and one or the other of them (he thinks, Mr. De Gottardi) first called his attention to the condition of the door and the confusion about the safe (that is, the papers and things scattered around in front of the safe), and asked him what he thought of it. He replied that it was a raw piece of work. He then asked them what they had called him over for. They said they wanted to talk to him,—were in a bad fix, left without anything, didn't know what to do, and wanted to advise with him. They said they were left with nothing, and they thought it was too bad at this time, and did not propose to be left with big families on their hands without anything, and asked him if he would be left that way if he could help it. They then asked him how it would do for him to put in his safe and keep for them some papers and things. He said he guessed that would be all right; that he thought the best thing would be to put the papers and things in a package, addressing it to some friends,—naming Silvia Righetti as a good man; and that he (Hardie) would see that it was delivered to him when he called for it. They asked other questions of the witness, and he told them that the questions were beyond him; that he was not a lawyer, and thought the best thing they could do was to send for their lawyer as quick as they could,—suggesting Mr. Dorn as a

good lawyer. Something was said also by the bankrupts about their creditors being after them. The examination then proceeded as follows:

"Q. Mr. Hardie, from the conversation you had with them, and what they said to you, was it papers and things that they wanted to hide from their creditors? Mr. Dorn: Object to it as irrelevant, incompetent, and immaterial, outside of the issues, and calling for the opinion and conclusion of the witness, without a foundation. The Court: Overruled. Mr. Dorn: Exception. A. I looked upon the thing just simply this way, at a glance,—that there was going to be a grand complication of affairs, and I didn't wish to have my foot in it. That is the reason that I refused to have anything to do with those papers. Q. Well, did you say anything to them to this effect: That you were not lawyer enough to tell them how to evade the law and still have the law protect them? A. Yes, sir, I did; something just to that effect. Q. From what they said, were they trying to evade the law? Mr. Dorn: Object to it as irrelevant, incompetent, and immaterial, outside of the issues, and calling for the opinion and conclusion of the witness, without a foundation. The Court: Overruled. Mr. Dorn: Exception. A. I took it for granted, from the conversation, that there was certain things that they had in their possession that they didn't wish to be attached, and that they simply wished to make my safe a depository. Mr. Dorn: I move to strike out the answer as not responsive, being the opinion and conclusion of the witness. The Court: Denied. Mr. Dorn: Exception."

The questions objected to were certainly intended to elicit and did elicit from the witness his own conclusion, drawn from his conversation with the bankrupts, that they intended to conceal from their creditors certain papers, and wished to deposit the same in his safe. This conclusion, it may be, is fairly deducible from the facts previously testified to by the witness; still it was a conclusion to be drawn by the court, not by the witness.

Another error complained of was the admission of the evidence of P. Tognazini to the effect that he had made investigations in the neighborhood of Cayucos to ascertain whether or not there were dairymen trading with De Gottardi & Righetti who had demanded cash from them instead of checks, and that he had found one. Tognazini previously testified that he had lived in that community for 30 years, and was a director of the Commercial Bank at San Luis Obispo. In order that the bankrupts' objections to this testimony may be understood, it should be stated that the bankrupts claimed that they had accumulated at the store the large amount of money of which they said they were robbed because some of their customers had demanded payment in cash, rather than checks, and if they were not able to comply with such demands the customers, to whom they might give checks would go over to Cass & Co.'s (a competing store) for the purpose of cashing the checks there, and would then transact other business with Cass & Co. To meet this claim of the bankrupts the above-mentioned testimony of Tognazini was offered. The testimony was clearly incompetent, being mere opinions and conclusions of the witness, and, what is worse, opinions and conclusions drawn necessarily not from facts within the knowledge of the witness, but from hearsay statements made to him by other parties.

Another ruling complained of is the striking out of the testimony of Righetti as to what De Gottardi told him about putting $1,500 into

the safe on the 30th of April. Righetti had just testified that he saw De Gottardi put money in the safe; that he did not count it, but that De Gottardi told him he had $1,500, and put it in the safe. The referee, on motion of the trustee's attorney, struck out what De Gottardi said, as incompetent, irrelevant, and immaterial. This ruling was erroneous. Whether or not De Gottardi had placed $1,500 in the safe was one of the matters in dispute, and his statements at the time were competent as a part of that transaction.

The misconduct charged against attorneys for the trustee consists mainly in asking incompetent and improper questions, insisting upon answers where the referee had sustained objections to the questions, and a transaction, which I will notice later on, with the witness Mary Malvate, a girl 17 years of age, who at the time of the alleged robbery was a domestic in the home of Mr. Righetti. That incompetent testimony, prejudicial to the bankrupts, was offered and admitted, appears from what I have already said. Besides the instances thus enumerated, an examination of Mrs. Tognina Righetti, wife of one of the bankrupts, is complained of as having been unfair to the witness and highly improper. Mrs. Righetti was born in Italy, and came to California when she was about 12 or 13 years old. Before marriage she lived with Mr. Padraita, her brother-in-law, at Cayucos, and went to school about one month at that place. She can write English a little, but not well. She is able to read printing to some extent, and plain writing. In the latter part of 1900 the witness declared a homestead on certain property in Cayucos, and it was to this matter that the objectionable questions related. Some of the questions and answers were as follows:

"Q. Well, you remember putting the homestead on this property, don't you? A. Yes, sir. Q. You remember signing the paper? Mr. Dorn: Object to that as irrelevant, incompetent, and immaterial, and outside the issues. The Court: Overruled. Mr. Dorn: Take an exception. A. Yes, sir. * * * Q. And you knew what was in the paper that you signed? Mr. Dorn: Same objection. The Court: Same ruling. Mr. Dorn: Exception. A. Well, I read it. Q. What was in it? A. Oh, I don't remember,—it been so long. Q. Did it say anything about a horse? A. I don't remember if it said anything about a horse. Q. Did it say something about farming implements and chickens? Mr. Dorn: Object to it as irrelevant, incompetent, and immaterial, not the best evidence, and calling for the contents of a written instrument. The Court: Objection sustained. Mr. Ach: Answer the question. A. I don't remember,—it has been so long since. Q. Well, don't you know that it spoke about furniture and beds and carpets and clothes and so forth, in that paper? Mr. Dorn: Object to it as irrelevant, incompetent, and immaterial, not the best evidence of the contents of a written instrument, and an improper mode of interrogating a witness,—unfair to the witness. The Court: Objection sustained. A. I suppose it did, but it been such a long time that I can't remember."

Counsel for bankrupts insist that the fact that the last two questions were held by the referee to be objectionable in no way mitigates their impropriety, that counsel for the trustee was interrogating an illiterate woman, and that by adroitly insinuating, through his questions, as true, matters which he knew to be untrue, he finally succeeded in getting the witness to affirm the false matters. This method of examination, which counsel for the bankrupts sharply criticise, I cannot myself look upon otherwise than with disapproval.

Another charge of misconduct against attorneys of the trustee is that they persistently repeated questions and insisted upon answers where the referee had sustained objections to the questions. This charge is without foundation. The correct practice, as I shall show later on, is to take down the answers to questions, without regard to the referee's rulings. The incident relating to Mary Malvate, complained of by the bankrupts, was brought out on the cross-examination of that witness by Mr. Dorn, as follows (the Mr. Gregg mentioned by the witness was associate counsel with Mr. Ach):

"Q. Since you were here before, have you talked with anyone besides Mr. Gregg about your testimony? A. Since I was here before? Q. Yes? A. No, sir; I guess I did with Giubbini. Q. I mean since you were here as a witness the last time you were here,—a week or so ago,—as a witness? Since that time have you talked with any one besides Mr. Gregg? A. No. Q. You haven't received any present or anything of that kind, have you? A. Yes, sir. Q. Well, who from? A. Mr. Ach. Q. Mr. Ach? A. Yes, sir. Q. What did you get? A. A box of candy. Q. Who delivered the present to you? A. This fellow over here. (Pointing.) Q. Mr. Gregg? A. Yes, sir. Q. So, since you were here as a witness before Mr. Gregg delivered for Mr. Ach to you a box of candy as a present? A. Yes, sir. Mr. Ach: That is objected to as assuming that Mr. Gregg delivered it for Mr. Ach. Mr. Dorn: Q. So, since you were here before, then, Mr. Ach has made you a present of a box of candy, and Mr. Gregg delivered the present to you? A. Yes, sir. Q. And was that the time that you talked with Mr. Gregg at Cayucos? A. Yes, sir. Q. Is that the only present you got? A. Yes, sir."

On re-direct examination by Mr. Ach the witness testified as follows:

"Q. Now, you say that you got a box of candy? A. Yes, sir. Q. Was it good candy? A. Fine. Q. You say Mr. Gregg brought it over to you? A. Yes, sir. Q. Well, did you tell Mr. Gregg anything more about the case than you told me on the witness stand before? A. He was asking me something, but I told him I didn't know any more. Q. Was that before or after he gave you the candy? A. I don't remember. Q. He told you it come from Mr. Ach, did he? A. Yes, sir. Q. Just Mr. Gregg give you candy, and said Mr. Ach sent it to you? A. Yes, sir. Q. You thought Mr. Ach was a real nice fellow, didn't you? A. Yes, sir."

This gift of candy, counsel for bankrupts, in argument, while disavowing any purpose to charge bribery, characterized with marked severity as indiscreet and violative of the duties of an attorney. In a written opinion heretofore, on the 7th day of January, 1902, read in open court, I fully indorsed said criticism. After said opinion had been read, Mr. Ach, counsel for the trustee, at his own request, and without objection, was sworn as a witness, and thus disclaimed any connection with or knowledge of the transaction until after its occurrence. The following order was then made:

"Thereupon it is ordered that the opinion just heretofore rendered, in so far as this matter is concerned, be held in abeyance for further consideration, and that the same be not filed of record until the further order of the court."

Mr. Ach's testimony shows satisfactorily that he was in no way connected with said gift of candy, and relieves him of any responsibility therefor. On January 25, 1902, Mr. Ach submitted in open court (counsel for bankrupts being present and offering no objection thereto) the affidavit of Mr. Gregg, stating, in substance, that on the 7th day of September, 1901, he drove to the town of Cayucos

to attend and direct the sale of a stock of goods belonging to the estate of the bankrupts, and for no other purpose, and that Mary Malvate was then, and for some time prior and subsequent thereto had been, a waitress at the Exchange Hotel, in said town; that on said day affiant, while visiting at said hotel, did, in the presence of several persons, whose names are unknown to him, give to her a small box of candy, which was then passed around among and eaten by the persons present; that he was not in the presence or hearing of said Mary Malvate for a longer time than 10 minutes, nor at any time away from the presence of others and that he did not see, nor attempt to see, her again until she again appeared as a witness in this proceeding; that the only reference made at the time to the testimony of said Mary Malvate was that affiant asked her if she knew anything more about the facts in said matter than appeared in her testimony, and she replied that she did not; that said question and answer arose out of a general conversation among those present as to the probability of an investigation being made by the federal grand jury, and that affiant did not then know or expect that she would be called again as a witness in said bankruptcy proceedings; that the candy was not given for the purpose of affecting her testimony or attitude towards any of the parties interested, or of inducing her to testify against said bankrupts, and was not given at the request or under the direction of Henry Ach or any other person; and that said gift was intended by this affiant solely as a personal courtesy. The object of the visit which Mr. Gregg says, in his affidavit, he made to the Exchange Hotel, was testified to by Miss Malvate, in that part of her testimony immediately preceding the questions and answers above quoted, as follows:

"Q. Since you were here as a witness before, did you ever talk with Mr. Gregg about this matter? A. I guess I did. Q. How many times? A. Once. Q. Where was that? A. I don't know when was it. That time he came up to Cayucos. Q. Well, where were you when you talked with Mr. Gregg about it? A. The Exchange. Q. The Exchange Hotel? A. Yes, sir. Q. I suppose he had lunch there? A. No, sir. Q. Called there to see you? A. He came to pay my expenses. Q. You mean your witness fees? A. Yes, sir. Q. Did you have any talk with him about what you knew about this case? A. I don't remember. I guess I did."

With Mr. Gregg's affidavit in the record, the following facts remain undisputed: That Mary Malvate was called as a witness twice by the trustee,—the first time several days before, and the second time a few days after, the gift of the candy; that Mr. Gregg went to said hotel to pay the girl her witness fees, and on that occasion gave her the candy, representing it as a gift from Mr. Ach, the leading counsel for the trustee, and asked her if she knew anything more about the facts in said matter than appeared in her testimony, and she replied she did not. That the transaction, as first shown in evidence, called for severe rebuke, will not admit of controversy, and, even in the light of Mr. Gregg's affidavit, it was a blamable indiscretion.

The foregoing rulings and matters, adverted to by me with disapproval, unquestionably disclose prejudicial errors by the referee, and misconduct on the part of the attorneys for the trustee, some

·of which may, without exaggeration, be denominated gross, and pre-·sent for settlement the proposition of law strenuously insisted upon by counsel for bankrupts, that for errors and misconduct such as .above indicated a referee's order ought to be set aside, regardless of what the competent evidence in the record may establish. In sup-port of said proposition it is argued, among other things, that a ref-eree under the present bankruptcy law differs from a register under the bankruptcy act of 1867 in this: that the former is clothed with important judicial powers, which the latter did not possess, and that among these powers is that of passing upon the competency, ma-teriality, and relevancy of testimony; that No. 22 of the general orders in bankruptcy and section 721 of the Revised Statutes of the United States, together and in effect, establish as the procedure to ·be observed by a referee where witnesses are examined, and by the judge on review of an order made as the result of such examination, that which obtains in the courts of law of the state wherein the bank-ruptcy court is located; and that under the laws of the state of Cal-ifornia the appropriate remedy for errors in the admission and ex-clusion of testimony and misconduct on the part of attorneys is. a new trial. The order in bankruptcy and the section of the Revised Statutes above mentioned are respectively as follows:

"XXII. Taking of Testimony. The examination of witnesses before the referee may be conducted by the party in person or by his counsel or at-torney, and the witnesses shall be subject to examination and cross-examina-tion, which shall be had in conformity with the mode now adopted in courts ·of law. A deposition taken upon an examination before a referee shall be taken down in writing by him, or under his direction, in the form of question and answer. When completed it shall be read over to the witness and signed by him in the presence of the referee. The referee shall note upon the depo-sition any question objected to, with his decision thereon; and the court shall have power to deal with the costs of incompetent, immaterial, or ir-relevant depositions, or parts of them, as may be just."

"Sec. 721. The laws of the several states, except where the constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply."

The first proposition stated in the bankrupts' argument, that a ref-eree is clothed with important powers,—among them, that of de-termining objections to testimony,—has been approvingly adopted by text writers (Coll. Bankr. [3d Ed.] 503; Loveland, Bankr. 502), and is unquestionably sound. Jurisdiction to hear and determine issues of fact necessarily implies power to pass upon the admissibil-ity of testimony. The last proposition of said argument, namely, that, under the state practice of California, for errors and miscon-duct such as appear in this record a new trial is the appropriate rem-edy, also seems to be well sustained by authority, and the rule is ap-plied in civil as well as criminal cases. Smith v. Westerfield, 88 Cal. 383, 26 Pac. 206; People v. Wells, 100 Cal. 460, 34 Pac. 1078; People v. Jacobs, 49 Cal. 384; In re James' Estate, 124 Cal. 653, 57 Pac. 578, 1008. The intermediate proposition of said argument, that No. 22 of the general orders in bankruptcy and section 721 of the Re-vised Statutes of the United States establish as the procedure before .a referee, where witnesses are examined, that of courts of law of the

state wherein the referee is sitting, is vulnerable. Its infirmity consists in this: that it unduly enlarges the scope of general order No. 22. I am inclined to think that the provision of said order requiring the examination and cross-examination to conform to the mode adopted in courts of law simply means that the witness, after being duly sworn, shall be first examined by the party introducing him, and then cross-examined by the adverse party, and that such examination and cross-examination shall be oral, and not upon written interrogatories. Whatever may be the precise limits, however, of that general order, it is sufficient to say here that it does not affect the practice on a review by the judge of an order made by the referee, nor the record which the referee should cause to be made up for the purpose of such review. Section 38a of the bankruptcy act of 1898 provides that "referees respectively are hereby invested, subject always to a review by the judge, * * * with jurisdiction," etc. The unlimited power of review here conferred upon the judge includes matters of fact as well as questions of law. There is nothing in the act prescribing the manner in which this review shall be had, nor is there any general order relating in terms to the subject, except No. 27, already quoted; and that simply requires the person desiring a review to file his petition therefor, setting out the error complained of, and the referee to forthwith certify to the judge the question presented, a summary of the evidence relating thereto, and the finding and order of the referee. The supreme court of the United States, however, has said:

"Proceedings in bankruptcy generally are in the nature of proceedings in equity; and the words 'at law,' in the opening sentence conferring on the courts of bankruptcy 'such jurisdiction, at law and in equity, as will enable them to exercise original jurisdiction in bankruptcy proceedings,' may have been inserted to meet clause 4, authorizing the trial and punishment of offenses, the jurisdiction over which must necessarily be at law, and not in equity." Bardes v. Bank, 178 U. S. 535, 20 Sup. Ct. 1000, 44 L. Ed. 1175.

General order in bankruptcy No. 37 is as follows:

"In proceedings in equity, instituted for the purpose of carrying into effect the provisions of the act, or for enforcing the rights and remedies given by it, the rules of equity practice established by the supreme court of the United States shall be followed as nearly as may be. * * *"

A proceeding before a referee, such as the present one, is essentially of an equitable nature. Issues of fact are to be determined by him without the intervention of a jury, and his order, if affirmed on review, is enforceable, not after the manner of courts of law, but by the process of commitment. General order No. 22 affects the equitable nature of this proceeding only to the extent of prescribing a common-law mode of taking testimony, which had previously been introduced by rule into equity practice. The pregnant fact here suggested, that said order is imitative, has, it seems, escaped the attention of counsel for bankrupts; and consequently they have overlooked authoritative interpretations, directly pertinent, which the supreme court has placed upon the archetype. I find, upon careful research, that general order No. 22 is taken largely, if not in its entirety, from No. 67 of the rules of practice for United States courts

of equity, and this fact of itself is a recognition by the supreme court of the equitable nature of the proceeding. That part of general order No. 22 on which counsel for bankrupts mainly rely, namely, "The examination of witnesses before the referee may be conducted by the party in person or by his counsel or attorney, and the witnesses shall be subject to examination annd cross-examination, which shall be had in conformity with the mode now adopted in courts of law," has its corresponding provision in that part of said equity rule No. 67 relating to the examination of witnesses before an examiner, as follows:

"Such examination shall take place in the presence of the parties or their agents, by their counsel or solicitors, and the witnesses shall be subject to cross-examination and re-examination, all of which shall be conducted as near as may be in the mode now used in the common law courts." 144 U. S. 689, 12 Sup. Ct. iii., 36 L. Ed. 1143.

Now, what is the practice at the hearing and on appeal in equity? There, as is well known, at the examination of witnesses, questions, objections, rulings, exceptions, and answers are all taken down, so that the appellate court, rejecting incompetent testimony, even though it may have been considered below, and considering competent testimony, even though it may have been rejected below, may render such final decree as the equities of the case require. Blease v. Garlington, 92 U. S. 1, 23 L. Ed. 521; Ruckman v. Cory, 129 U. S. 387, 9 Sup. Ct. 316, 32 L. Ed. 728; Mining Co. v. Doe, 27 C. C. A. 50, 82 Fed. 51; Ridings v. Johnson, 128 U. S. 212, 9 Sup. Ct. 72, 32 L. Ed. 403; Johnson v. Harmon, 94 U. S. 371, 24 L. Ed. 271; Beach, Mod. Eq. Prac. §§ 978, 980.

In Blease v. Garlington, supra, the court, speaking through Chief Justice Waite, says:

"Since the amendment of rule 67, in 1861, there could never have been any difficulty in bringing a case here upon appeal, so as to save all exceptions as to the form or substance of the testimony, and still leave us in a condition to proceed to a final determination of the cause, whatever might be our rulings upon the exceptions. The examiner before whom the witnesses are orally examined is required to note exceptions, but he cannot decide upon their validity. He must take down all the examination in writing, and send it to the court, with the objections noted. So, too, when depositions are taken according to the acts of congress or otherwise, under the rules, exceptions to the testimony may be noted by the officer taking the deposition, but he is not permitted to decide upon them; and when the testimony, as reduced to writing by the examiner, or the deposition, is filed in court, further exceptions may be there taken. Thus both the exceptions and the testimony objected to are all before the court below, and come here upon appeal as part of the record and proceedings there. If we reverse the ruling of that court upon the exceptions, we may still proceed to the hearing, because we have in our possession and can consider the rejected testimony. But under the practice adopted in this case, if the exceptions sustained below are overruled here, we must remand the cause in order that proof may be taken. That was done in Conn v. Penn, 5 Wheat. 424, 5 L. Ed. 125, which was decided before the promulgation of the rules. One of the objects of the rule, in its present form, was to prevent the necessity for any such practice. While, therefore, we do not say that, even since the Revised Statutes, the circuit courts may not, in their discretion, under the operation of the rules, permit the examination of witnesses orally in open court upon the hearing of cases in equity, we do say that now they are not by law required to do so, and that, if such practice is adopted in any case, the testimony presented

in that form must be taken down or its substance stated in writing and made part of the record, or it will be entirely disregarded here on an appeal. So, too, if testimony is objected to and ruled out, it must still be sent here with the record, subject to the objection, or the ruling will not be considered by us. A case will not be sent back to have the rejected testimony taken, even though we might, on examination, be of the opinion that the objection to it ought not to have been sustained."

The fourth paragraph of the syllabus in Ruckman v. Cory, supra, also a decision by the supreme court of the United States, is as follows:

"Although incompetent evidence be received in an equity case, yet, if the decree can be sustained by such evidence in the record as is competent and relevant, this court will not disturb the decree."

In the body of the opinion, the court says:

"(3) Reference is made to the depositions of several witnesses, including the plaintiff, who testified in his own behalf, in which are detailed statements made by Ruckman at different times after 1862 in reference to the title to these lands. This evidence, it is contended, and properly so, was incompetent, under the well-established rule that 'a grantee in a deed is not affected with the declarations of the grantor made after the execution and delivery of the deed, unless, with full knowledge of such declarations, he acquiesces in or sanctions them.' * * * But the question remains whether the decree cannot be sustained by such evidence in the record as is competent and relevant. We think it can. At any rate, after a careful sifting of the proof, and giving due weight to all the facts and circumstances that may properly be considered, we do not see our way clear to disturb the decree."

In Mining Co. v. Doe, supra, the circuit court of appeals of this circuit held (quoting from the syllabus):

"3. Appeals in Equity—Findings of Fact. On an appeal in equity, findings of fact made by the court below are entitled to some weight, but are not binding on the appellate court. The whole case is before the latter court, and it is bound to decide the same, so far as it is in a condition to be decided, on its merits."

It is true that an examiner in equity does not pass upon objections to evidence, while a referee in bankruptcy must do so. This, however, furnishes no reason why the record made up by the latter should be less complete than that made up by the former. The necessity for a full transcript is the same in each case,—in the one case, that the decree of the appellate court, and in the other that the order of the judge on review, may finally determine all matters at issue. Moreover, where the examination of witnesses is had orally in open court, as may be done under the amendment to equity rule No. 67, promulgated by the supreme court May 15, 1893 (149 U. S 793, 13 Sup. Ct. iii., 37 L. Ed. 1235), the judge does pass upon the admissibility of testimony; and in that case a hearing in equity and a proceeding (such as the present one) before a referee in bankruptcy are substantially alike. The judge and referee, it is true, do not occupy towards each other the relation of an appellate to an inferior court, but are both officers of the bankruptcy court. This circumstance, however, does not weaken, but, rather, confirms, the conclusion which I have reached as to the power and duty of the judge on review of an order of the referee. If, in equity, an appel-

late court, regardless of errors and irregularities at the hearing, exercises complete supervision over the decree of the lower court,— the two being distinct tribunals,—and confirms, reverses, or modifies the decree so as to administer final relief upon the competent evidence in the record, for a much stronger reason ought the judge, in a bankruptcy proceeding, to exercise equally as full control over the order of the referee, where both judge and referee are not only of the same court, but each for the time being constitutes the court, and where, therefore, a review by the judge of the referee's order is theoretically a review by the court of its own decision.

In re Nugent, 44 C. C. A. 620, 105 Fed. 181, and Smith v. Belford, 45 C. C. A. 526, 106 Fed. 658, cited by the bankrupts, do not, I think, support their contention. In each of those cases it was expressly held by the court of appeals that the district court was without jurisdiction to make the orders complained of, and, of course, there was nothing the appellate court could do but set aside the orders. In re Keller (D. C.) 109 Fed. 118, also cited by the bankrupts, is, according to my view of the case, favorable to the procedure which I have outlined, rather than to that contended for by the bankrupts. There the trustee in bankruptcy contested the right of a creditor to prove up his claim on the ground that, within four months next preceding the filing of the petition in bankruptcy, bankrupt had made payments to the creditor, and that at the times of such payments the bankrupts were insolvent. Thus it will be seen that one of the issues before the referee was the alleged insolvency of the bankrupts, and the referee found that the bankrupts were insolvent, as alleged by the trustee. With reference to the finding of the referee on this issue, Judge Shiras says:

"As I understand the certificate of the referee, this conclusion was reached upon consideration of the facts appearing of record in the bankruptcy proceedings, and of the testimony given upon the examination of the bankrupt and other parties before the referee in connection with other proceedings had in the case; and upon part of the present claimant it is excepted that this evidence was introduced when the claimant was not present and was not represented."

This exception was held to be good, and, since there was no other evidence to support the finding, the judge referred that particular issue back to the referee for further testimony; affirming, however, the report of the referee in other respects. If the practice were as contended for by bankrupts' counsel,—that error in the admission of testimony wholly vitiates the order made by the referee,—then the referee's entire order in the case last cited would have been reversed, and the whole matter referred back to him, whereas only one issue was sent back to the referee, and the balance of the order affirmed.

Marks v. Fox (C. C.) 18 Fed. 713,—another citation of bankrupts' counsel,—seems, on casual reading, to hold that on the coming in of a master's report in an equity cause, showing the admission of incompetent testimony and the exclusion of competent testimony, the matter should be referred back to the master to take additional testimony, reconsider the proofs, and report conclusions. A more careful reading of that case, however, indicates that the excluded

testimony was not in the record before the judge. The following paragraph occurs in the opinion of the court:

"The master erroneously sustained the objections to interrogatories 20, 28, 34, 38, 47, 49, 50, 51, and 52, propounded to the witness Henry King, and to interrogatories 17, 21, 44, 46, 65, 72, 75, 76, and 81, propounded to Aaron Grant. While some of these interrogatories do not seem to have been of much importance, others were, and the general result of the master's rulings has been to deprive the defendants of testimony which was clearly competent and material. It is for the master to determine what weight should be given to this testimony when it is in the case. It may be that his conclusions will not be affected by it, but upon this review of his findings it cannot be determined that they were not influenced by the absence of the evidence which the defendants sought to introduce."

If the interrogatories which the master held to be incompetent were not answered, then, of course, there was nothing else the judge could do, except send the matter back to the master to take the testimony which had been erroneously excluded.

Equitable procedure before the referee, and by the judge on a review of the referee's order, such as I have outlined, is approvingly epitomized by a well-known text writer on bankruptcy as follows:

"It would therefore seem that referees have power to pass upon the competency, relevancy, or materiality of any question in the course of an examination, subject to have the question reviewed by the judge upon certificate. The more convenient practice would seem to be for the referee to make his rulings, and thereupon require the question to be answered. If his ruling be against the question, and the court should reverse his finding, it would not be necessary to have a re-examination of the witness. If the court should affirm such ruling, the answer may properly be disregarded. The examination should continue, and the question be certified after the deposition is completed, to prevent delay." Loveland, Bankr. 502.

My conclusions on this branch of the case are: First, that in a proceeding before a referee, such as the present one, a record should be made of all that transpires on the examination of witnesses,—questions, objections, rulings, exceptions, and answers should all be taken down; second, that, on a review of the order made by the referee, the judge should look through the whole record, and, considering only competent and material evidence, affirm, modify, or reverse, with suitable directions, the referee's order, accordingly as the circumstances of the case require. If, as in the present case, the order be one whose enforcement may call into exercise the power of commitment, and the judge is not satisfied beyond a reasonable doubt of the sufficiency of the evidence to justify the order, he should set it aside, and either put an end to the proceeding, or refer the matter back to the referee, with appropriate instructions. If, however, there is in the record enough of competent and relevant evidence to justify the order, either wholly or in part, it should be accordingly affirmed or modified, notwithstanding there were errors and misconduct such as shown in the present case on the hearing before the referee.

The jurisdiction of the court being established, and the rules of procedure for its exercise determined upon, I now come to a consideration of the facts. The evidence is voluminous, covering more than a thousand pages, and its review now is impracticable. A few only of the salient points can be mentioned. The recitals of facts

made in the referee's findings are fully sustained by the evidence. In addition to those recitals, a few other matters will be stated.

The bankrupts began business as merchants and partners, under the firm name of De Gottardi & Righetti, in the year 1896, at Cayucos, in this state,—a village of two or three hundred inhabitants,—and continued the business until May 2, 1901, when the store was attached. On the 23d of January, 1901, the bankrupts, as appears from the books of the firm, took an inventory of their property and indebtedness, from which it appeared that the former was $19,018.18, and the latter $2,050.06. The schedules of the bankrupts, filed herein on the 1st day of July, 1901, but which exhibit the condition of the estate at the time of the attachment, May 2, 1901, represent their assets at $28,964.37 and their debts at $22,824.70. The deficiency of assets shown by the schedules in bankruptcy ($6,039.67), added to the surplus of assets shown by the inventory of January 23, 1901, makes a total loss between January 23, 1901, and the 2d day of May, 1901 (a period of a little more than three months), of $23,007.82. The startling change thus exhibited led to judicial inquiry; and an examination of the bankrupts and other witnesses, for the purpose of acquiring information generally concerning the bankrupts' estate, was begun, at the instance of the creditors, before the referee, August 11, 1901. At this examination, which was prior to the present proceeding, one of the bankrupts (Natele De Gottardi) declined to answer competent and material questions touching the business and property of the bankrupts, on the ground that his answers might incriminate him. As showing the disposition of the bankrupt at that time, I quote from his examination the following questions and answers:

"Q. When you started into business with David E. Righetti, did you have any money? A. I decline to answer that question on the ground that my answer might tend to criminate me, and might be made the foundation of a criminal action against me, and might have a tendency to subject me to punishment for a crime."

This answer witness read from a piece of paper previously prepared and handed to him by his attorney, Mr. Dorn.

"Q. Did you make an inventory of the assets of your business (the business of De Gottardi & Righetti) in January, 1901? A. I decline to answer to that on the same ground I did before. Q. What ground is that, Mr. De Gottardi? A. I decline to answer that question on the ground that my answer might tend to criminate me, and might be made the foundation of a criminal action against me, and might have a tendency to subject me to punishment for a crime. * * * Q. Mr. De Gottardi, on the 27th day of April, 1901,—the day being Saturday,—did you not, for your firm of De Gottardi & Righetti, receive some money at Cayucos? A. I decline to answer on the same ground. Q. Did you not on that date receive $360 in money from Peter or Paul Maddona? A. I decline on the same ground. Q. Did you not upon that date receive from Peter Maddona the sum in addition, of $600, or about that amount of money, in a check or draft? A. I decline to answer on the same grounds. Q. Did you not take that money, and appropriate it to your own use, and withhold it from your creditors, and conceal the money? A. I decline to answer on the same grounds. Q. On the 27th day of April, 1901, did you not have in your possession at your store in Cayucos a sum of money in coin in excess of one thousand dollars? A. I decline to answer on the same ground. Q. Mr. De Gottardi, did you not have in your possession at your house in the city or town or place called 'Cayucos,' in the

county of San Luis Obispo, on the 30th day of April and the 1st day of May, 1901, the sum of fifteen hundred dollars in money? A. I decline to answer on the same ground. Q. Did you not prior to the 27th day of April, 1901, to wit, about the 25th day,—the 26th day of April, 1901,—receive communications from various of your creditors, and particularly the Commercial Bank of San Luis Obispo and the Andrews Banking Company of San Luis Obispo, calling attention to the fact that the account of De Gottardi & Righetti was overdrawn, and requesting you to remit? A. I decline to answer on the same ground. Q. Did you not on the 27th day of April, in the afternoon or evening of that day, leave Cayucos,—1901? A. I decline to answer on the same ground. Q. Did you not on the 27th day of April, 1901, when you left Cayucos, have in your possession drafts and coin belonging to the firm of De Gottardi & Righetti in excess of $4,000? A. I decline to answer on the same ground. Q. Did you not while in the city of Los Angeles receive from the firm of Loeb, Fleishman & Co. in excess of six thousand dollars belonging to the firm of De Gottardi & Righetti? A. I decline to answer on the same ground. Mr. Ach: Haven't you that money now? A. I decline to answer on the same ground. Q. Haven't you that money in hiding and in your possession at this time? A. I decline on the same ground, sir, to answer. Q. What did you do with that money? * * * A. I refuse to answer that question on the same ground. Q. Mr. De Gottardi, did you not have in your possession on Wednesday, the 1st day of May, 1901, and in the possession of the firm of De Gottardi &. Righetti, checks payable to De Gottardi & Righetti, or a check payable to De Gottardi & Righetti, in excess of two thousand dollars? A. I refuse to answer that question on the same ground. Q. Did you not have such check, and did you not give it to Mr. Dorn, the gentleman who appears here for you as counsel? A. I refuse to answer that question on the same ground. Q. Did you not on the morning of the 1st day of May, 1901, telephone to Mr. Dorn, in the town of San Luis Obispo, to come over to Cayucos? A. I decline to answer on the same ground, sir. Q. You mean all the time, when you say the same ground, the same ground that you read from that piece of paper that you carry with you? A. Yes, sir. Q. Did you not ask the advice, before the arrival of Mr. Dorn, of some person in the city or town of Cayucos, as to what you should do with the collaterals and the moneys that you had? A. Decline to answer on the same ground. Q. Do you now know that David Righetti has in his possession at this time moneys belonging to the firm of De Gottardi & Righetti? A. I decline to answer that question on the same ground. Q. Do you now know that at this time the attorney, Mr. F. A. Dorn, has in his possession moneys or property belonging to the copartnership—the firm—of De Gottardi & Righetti? A. I decline to answer that question on the same ground."

Without quoting further from said examination, it is sufficient to say that whole pages of questions, competent and material, were propounded to the witness, which he persistently refused to answer on the grounds stated. The refusals of De Gottardi were certified to the judge, who ruled that the questions must be answered. Before said ruling was announced an examination of David E. Righetti, one of the bankrupts, was had; and he also refused, on the same ground, to answer a great many competent and material questions concerning the bankrupts' estate. He also declined, on the same ground (that is, on the ground that it might tend to criminate him), to answer questions as to his whereabouts during the night of the alleged robbery, April 30, 1901, as follows:

"Mr. Ach: Q. Mr. Righetti, were you in Cayucos on the 30th of April, 1901? A. I decline to answer that question. Q. Why? A. On the same ground stated before. * * * Mr. Ach: Q. Mr. Righetti, did you not go into your store on the night of the 30th of April, 1901, after the store was closed, and open the safe? A. I decline to answer that question on the same ground, sir. * * * Mr. Ach: Q. What time did you go to bed on the

night of the 30th of April, 1901? A. I decline to answer that question on the same grounds. * * * Mr. Ach: Q. After you left the store on the night of the 30th of April, 1901, did you have a meeting with Mr. De Gottardi anywhere in Cayucos? A. I decline to answer that question on the same ground, sir. * * * Mr. Ach: Q. Don't you know what became of the money that Mr. De Gottardi brought up from Los Angeles? A. I decline to answer that question on the same ground. * * * Mr. Ach: Q. Did anybody tell you to decline to answer these questions? A. Yes, sir. Q. Who? A. My lawyer. Q. What is his name? A. Mr. Dorn."

Subsequently, in the pending proceeding, the bankrupts appeared before the referee and expressed their willingness to answer the questions which they had previously declined to answer, but counsel for the trustee did not see fit to call them as witnesses. They took the stand, however, in their own behalf, and explained their previous refusals by saying, in substance, that they thought, from the actions of some of the creditors and their attorneys, that the examination was not a fair one, and that the creditors and their attorneys were simply seeking grounds to charge them with a crime, and were trying to confuse them, and would take advantage of any mistake they might make. The apprehensions thus avowed by the bankrupts are not usually attendant upon a course of fair dealing, and their refusals to answer proper questions, so unsatisfactorily explained, together with the facts that such refusals were the result of an agreement between the bankrupts and their attorney, made before the examination begun, ill comport with an honest failure in business, or truthful accounting for assets. De Gottardi's claim that he gave $6,000 to a woman and $425 to a doctor involves the admission that he did have that amount of money in his possession, belonging to the estate of the bankrupts. This fact, however, is also testified to by Righetti, as well as evidenced by the books of the firm. The only question, therefore, to be determined on this branch of the case, is whether or not De Gottardi's statement of his disposition of the money is to be believed. It has been said by high authority:

"The bankrupt, when on examination, after admitting the possession of property, must clearly account for the same to the satisfaction of the court; otherwise he must be held to still have it in his possession, and be able to hand it over to his assignee, and, on failing or refusing to account in a reasonable manner for the disposition of assets which have been traced to him, must be held to be acting in contempt of the jurisdiction of the court." In re Salkey, 21 Fed. Cas. 238 (No. 12,253).

Can it be claimed that De Gottardi has accounted in a reasonable manner for the $6,500 which he admits to have been in his possession but a short time before the petition in bankruptcy was filed, by asserting that he gave $6,000 to a woman and $425 to a doctor, when he refuses, on cross-examination, where there is no immunity from self-criminatory evidence, to name the woman or the doctor to whom he says the money was given? Such a claim would be preposterous. If his testimony in this regard had been true, its corroboration would have been within his power. In the absence of such corroboration, under all the circumstances of this case, the issue cannot be otherwise found than against him.

The claim of the bankrupts that they were robbed of $7,500 is likewise an admission of the fact that they did have in their possession

that amount of money belonging to their estate. Here, again, the question to be determined is whether or not the testimony of the bankrupts in regard to the alleged robbery is to be accepted as true, or rejected as false. It has been said:

"A bankrupt should have the disposition to comply with the law,—candidly to account for his property. The law requires it. He is entitled to fair consideration from the court and its officers. The case is very different where the bankrupt is contumacious, as this man was in the first instance, and as he probably has been in some degree all along. In that case, where the bankrupt fails to testify fully and fairly and truthfully, the court or the referee is at liberty to accept his testimony as it may seem to be supported by other witnesses. If at any point it is found that his testimony is unworthy of credit, it may be rejected altogether." In re Tudor (D. C.) 100 Fed. 796.

On this issue of the alleged robbery, as on the one already disposed of, the referee's finding is fully justified by the evidence. There is no room for controversy but that the bankrupts accumulated the large amount of money, of which they claim they were robbed, for the purpose of in some way concealing it from their creditors. This and the other facts enumerated by the referee are sufficient to determine said issue against the bankrupts. Furthermore, the immediate circumstances of the alleged robbery confirm its improbability. Forcible means were not employed in opening the safe. Neither drill nor explosive was used. The safe was opened by some one familiar with the combination, or else the combination was not turned on the night of the robbery. There was no indication of a forcible entry into the house, other than an auger hole through the back door, designed, apparently, to reach a bolt which fastened the door; and this hole was so located with reference to the bolt and a defective and unused lock as to show that the hole was bored by one who knew of the situation and use of the bolt, as well as the disuse of the lock. To my mind, the boring of this hole was a mere artifice on the part of the bankrupts to divert suspicion from themselves.

Upon the competent evidence in the record, there can be no reasonable doubt but that there was on the part of the bankrupts a deliberate scheme to defraud their creditors, and that the alleged payments to a woman and doctor and the alleged robbery were fictitious, and parts of said scheme. These conclusions are fully warranted by the facts which the referee enumerates in his findings, and strengthened by the further facts that the bankrupts have at other times made or attempted dispositions or arrangements of different pieces of property, which, if successful, will place those pieces of property beyond the reach of their creditors. To some of these dispositions and arrangements I will make hurried reference:

De Gottardi claims to have sold his half interest in the store March 15, 1901, to his brother-in-law, Giorgi, for $1,500 cash, a part of which he says he gave to the woman, and the other part was abstracted from the safe. Righetti in the latter part of the year 1900 drew out of the partnership money, with which he bought a residence in Cayucos, upon which his wife afterwards declared a homestead. Righetti also claims that in October or November, 1900, he gave his wife a note for $2,025, which she still holds. The evidence relat-

ing to these transactions reveals such badges of fraud as to throw serious doubt upon the integrity of each.

The last and most remarkable of the various dispositions of property by the bankrupts charged to have been in fraud of creditors was the transfer on May 1, 1901, to their attorney, F. A. Dorn, of two checks,—one for $2,058.18, and the other for $685.76,—upon an alleged agreement that $2,000 was a retainer for services to be rendered in searching for the burglars, and their prosecution, if found, to final conviction, and the balance to be applied on a past indebtedness of $800. Mr. Dorn, in one part of his examination before the referee, testified to this agreement as follows:

"Q. What did they give you this $2,800 for, Mr. Dorn? A. Well, they gave it to me because they owed me considerable money, and because I demanded it,—I was weary of working on jawbone,—and because I wanted a retainer for my work I expected to do with reference to the robbery. In fact, I was employed to investigate this robbery, trace it out, and discover the robber or burglar, if possible, and prosecute him to a finish if he was found. The whole matter was placed in my hands, and this money was given as a retainer, and on account of what they owed me prior to that time. Two thousand dollars was a retainer, and the balance was applied on an indebtedness which existed in my favor against them at that time."

In another part of his testimony Mr. Dorn stated the agreement thus:

"The understanding was that $2,000 was a retainer in the burglary matter, and anything that might arise out of it, and the balance would be applied on the indebtedness that existed prior to that time. Of course, the two thousand dollars retainer was to cover any services that might be rendered in the robbery or burglary case, whichever you might call it, and any other litigation that might arise out of it."

From other evidence in the case it appears that, early on the morning of the day the two checks were transferred to Mr. Dorn, the bankrupts consulted with Mr. A. M. Hardie, the postmaster at Cayucos, with whom they had frequently advised before in confidential matters. They told Mr. Hardie, in substance, among other things, that they did not propose to be left without anything. The fair inference from Hardie's testimony about his interview with the bankrupts is that they sought him for the purpose of placing in his hands certain papers and other things, so as to get them beyond the reach of their creditors and secure the same to themselves. He told them, in substance, that it was difficult to keep within the protection of the law and yet evade its provisions, and that they had better consult with their lawyer. They immediately telephoned to Mr. Dorn, who for a number of years had been their attorney in different matters, and requested him to come out to Cayucos, which he did. The bankrupts and Mr. Dorn testified concerning this matter. Neither of them was able to specify a single employment or service to make up the alleged past indebtedness which Mr. Dorn told them was $800, and on which they claim nearly that amount was paid. Three cases begun in justices' courts were mentioned by Mr. Dorn, but in one case the testimony expressly showed that he had received his fee, while the inference is a fair one, from all the evidence, that the fees had also been paid in the other cases. Mr. Dorn testified: That

prior to his partnership with Mr. Green, November 15, 1900, he did not keep books of account, and that he had no books showing any services rendered to, or charges made against, De Gottardi & Righetti, prior to that date, and could not remember that he had any business transactions with them from the 15th day of November, 1900, to the 25th day of April, 1901, "unless it was consultations of some sort;" and, when asked if he remembered any consultations, he replied: "No; I don't recall definitely any consultations. In all likelihood, they did consult the firm,—one or the other of the members,—but I have no recollection of any particular transaction." That he never made any demand upon De Gottardi & Righetti for the $800, or any part of it, before the time said checks were turned over to him, nor was any bill ever rendered for the same, or any part of it, and that he had never called on De Gottardi & Righetti for money without getting it. He was asked if the bankrupts made any objection to his claim of $800, and answered:

"Yes, sir; they kicked about it a little bit. They thought it was too much. Something to that effect. I know I learned, from either the expressions on their faces or from what they said, that they thought it was a pretty steep charge. I didn't think they liked it very well."

The cross-examination of Mr. Dorn was as follows:

"Mr. Ach: These are statements in cross-examination by Mr. Dorn without objection by Mr. Ach. The Witness: Referring to the check for $2,058.18, concerning which the witness had testified, and the check or draft for $685.76, marked 'Exhibit H3,' concerning which the witness had been interrogated after the proceedings before the present referee had been commenced, the following order was made by the referee and served on me, after the title of the court and cause: 'The parties hereto being this day in open court; trustee appearing by Henry Ach and Paul M. Gregg, as attorneys; F. A. Dorn in proper person; said parties having stipulated in open court that all testimony taken and produced in the matter of the bankrupts above named, and on the examination of the bankrupts, stand as testimony in this matter, neither of said parties hereto desire to submit any further testimony, and said parties in open court waiving the making and filing of findings of facts herein, and the matter stand submitted upon said testimony. It is hereby ordered that the said F. A. Dorn has in his possession, belonging to the estate of the bankrupts, the sum of $2,743.94; and it is ordered that the said F. A. Dorn pay said money, and all thereof, to Edward Vollmer, trustee in bankruptcy, within five (5) days from and after the date hereof. This order is not made, however, upon the ground or theory that said F. A. Dorn has been guilty of any fraud. That said firm of De Gottardi & Righetti at the time the money above mentioned was received by said Dorn was insolvent, but said Dorn had no knowledge thereof. This order is made without prejudice to the attorneys of the bankrupts making any application for an order allowing them attorney's fee in the matter of said bankrupts' estate. Dated this 3d day of September, 1901, Louis Lamy, Referee in Bankruptcy.' That order was served on me, or, rather, a copy of it; and I turned over to one of the attorneys for the trustee, Mr. Vollmer, the amount specified in the order, to wit, $2,743.94,—being the amount of the two drafts concerning which the witness has testified."

The foregoing is a brief summary of the evidence appearing of record when my opinion was read in open court on the 7th of last month, as hereinbefore stated. Said opinion then contained strictures upon Mr. Dorn different in some particulars from those herein expressed; and, at the conclusion of its reading, Mr. Britt, counsel for bankrupts, requested that said strictures be held in abeyance "un-

352     114 FEDERAL REPORTER.

til said Dorn. may appear before this court, if he may so choose, and exculpate himself from any complicity in an intention to defraud the creditors in this case." Whereupon it was ordered that said opinion, so far as concerns said matter, be held in abeyance for further consideration, and that said opinion be not filed until the further order of the court. On January 25, 1902, Mr. Britt, pursuant to said request and order, submitted in open court (Mr. Ach, counsel for the trustee, being present and making no objection thereto) an affidavit of Mr. Dorn as follows:

"On May 1, 1901, I received from De Gottardi & Righetti, at Cayucos, a telephone message requesting me to go at once to Cayucos. I complied with the request, and reached Cayucos about 12 m. the same day. I did not know of the alleged burglary until I met some parties on the road about ten miles from the city of San Luis Obispo, who informed me that the safe of De Gottardi & Righetti had been robbed the night previous. On reaching Cayucos I was informed by De Gottardi that their safe had been robbed, and that some of their creditors were already threatening attachment. They also made statements to me to the effect that they were entirely solvent, and that pressure from their creditors would only result in loss to the firm and their temporary embarrassment. I believed them to be entirely solvent, even after the loss of the sum alleged to have been stolen, and continued in that belief until some time thereafter, as hereinafter stated. They desired to employ me to trace out the burglary, recover the money, if possible, hire detectives, if necessary, and prosecute to the end the guilty party. Also to represent them in dealing with their creditors, preventing suits, if possible, and appearing for them until payment could be made in case suits were brought. I appreciated the fact that an employment of this kind might involve a great deal of labor and expense. The burglar must first be detected; the evidence found to convict; the trial; the probable appeal to the supreme court; the possibility of a new trial being granted, and a new trial or trials being had. Also that, in their first excitement, creditors might attach and that meetings of creditors would have to be attended. They told me that they had but a small sum of cash in their immediate possession, but that they had several thousand dollars due them from Loeb, Fleishman & Co., of Los Angeles, and they had in their possession the two drafts or checks aggregating $2,743.94, which are in evidence. I asked them to transfer to me the two drafts. They did so, and I accepted the employment. I did not know, and had never heard of the 'Giorgi transaction,' the note transaction with Mrs. Righetti, or the 'Maddona transaction,' at that time. I employed Mr. C. R. Soberanes to work on the case as a detective, and paid him for his services and expenses the sum of $350. I went with Mr. De Gottardi to see the officers of the Commercial Bank, one of their main creditors, who had attached, endeavored to arrange with them for a release of the attachment, and offered to allow any one the creditors might select to take charge of the property for their protection until all creditors were paid. Arranged and attended, by my partner, Mr. Green, at our own expense, a meeting of the San Francisco creditors; and the reception there accorded, by whom, and the manner of accusation, is disclosed by the record. The report of that meeting was my first information of the payment by Mr. De Gottardi to a woman or doctor of any sum of money. I appeared in five different suits brought by creditors, and advanced the necessary costs, aggregating $10. After the adjudication in bankruptcy, a proceeding was instituted before Referee Lamy to set aside the transfer to me of the two checks or drafts in question. I fully appreciated the fact that neither the referee nor the courts in bankruptcy had jurisdiction of this matter, but I appeared, denied any improper motives or intent on my part in the transaction, and tacitly consented to the order being made as disclosed by the record. The order was made, and I paid to the trustee the entire sum received by me, to wit, $2,743.94. I was convinced at that time that De Gottardi & Righetti were bankrupt when they paid me the money, and that it was an unauthorized preference, though I am

still convinced that enough could have been realized from their assets, by judicious management, to have paid their creditors in full. I felt that my honor was involved in this proceeding, and though I was entitled to retain a reasonable fee for services rendered and to be rendered in the bankruptcy matter, and possibly all sums expended, I made no effort to do so; and the order was made, as hereinbefore stated, to pay over the entire sum. That order exonerated me from any blame or wrongful participation in the transaction, though it required me to give up money which I was entitled to retain. No request was made by any of the interested parties that said order, or any part thereof, be certified to this honorable court for review.

"Former Indebtedness. The firm of De Gottardi & Righetti was indebted to me when I made the trip to Cayucos. The amount, extent, or particulars of that indebtedness are not fully disclosed by the record before this court. There was no effort made to collect that fee from this money, and I deemed it not necessary or proper to go into that matter fully before the referee, when it was not at issue. (There is a mass of testimony on this subject taken on the original examination of the bankrupts, though even then no effort was made to present my side of the question.) A claim will probably be presented in this matter on that indebtedness, and, if it is contested, all of the facts in relation thereto will be at issue, and may come before this court for review.

"Reasonableness of Fee. I have been actively engaged in practicing my profession before the state courts for over fifteen years, and am familiar with fees charged and paid for legal services in San Luis Obispo county. The employment might have resulted in appearing and even trying a great number of civil cases; attending an indefinite number of creditors' meetings at different places, so that the business might be carried on to their satisfaction; the possible recovery from the burglar of a large sum of money; the detection of the burglar; finding evidence to convict him; his trial before a jury, which would ordinarily take ten days or more; one or more appeals to the supreme court; and the possibility of one or more new trials. Had these services been rendered, and the whole sum received been paid for the same, the fee would not, in my opinion, have been extravagant or unreasonable.

"Secret Trust. There never was an understanding or intimation that this money, or any part thereof, should be held for the bankrupts, or either of them, or that any of it should at any time be returned to them, or either of them, or held in trust for them in any manner.

"Notice of Decision and Opportunity to be Heard. Had I anticipated that my connection with this matter was under consideration by the court, I would have been present and endeavored to make matters plain to the court. It may be said that I am charged with knowledge of that which the record contains; but I am not a party to this proceeding; my acts have been adjudicated by the referee; his judgment has been complied with, and has not been certified here for review. Under these circumstances, I assumed that the referee's decision was final; that, so far as an adjudication against me was concerned, that the referee's decision stood until certified to this court: that the question of past indebtedness was one which could only arise when a claim was presented; that the amount of a reasonable fee or retainer could only arise on a claim being presented therefor. For these reasons, among others, I have not heretofore explained my connection with this matter to the court."

After a careful review of all the evidence in the case, I am forced to the conclusion that the bankrupts were not indebted in any amount whatever to Mr. Dorn at the time the checks in question were turned over to him. A retainer of $2,000 as a reasonable professional employment to investigate the alleged robbery, and prosecute the thief if found, is too preposterous for serious comment, and even its bona fides might well be questioned. It is true that Mr. Dorn, in his affidavit, states the scope of his retainer much more broadly than he stated it on the witness stand before the referee. Whether or not his

114 F.—23

last version, however, if accepted as the correct one, would better the situation it was designed to improve, is doubtful. The bankrupts would not, under the circumstances which surrounded them, have used a large amount of their assets—practically all the cash they had on hand—in the employment of attorneys to negotiate with and obstruct the legal remedies of their creditors, but would have promptly applied the money thus wrongfully used to their just debts, where it equitably belonged, if their purposes had been honest and their dealings upright. One or the other of two things is true,—either the bankrupts transferred said checks to Mr. Dorn with an understanding that he should return to them the money collected thereon, between $2,700 and $2,800, or a part of it, or else the bankrupts were so perturbed and alarmed at their situation that they weakly submitted to an unrighteous exaction. Said transfer would be, under the former alternative, in direct line with, and, under the latter, a natural outgrowth from, the scheme, otherwise shown, to defraud creditors, and is therefore, in either event, corroborative evidence of the falsity of the bankrupts' stories of a robbery and an intrigue with a woman. Mr. Dorn's connection with said transfer cannot be passed over in silence. Although not admitted to the bar of this court, he is a practicing attorney at law, and represented the bankrupts before the referee in the proceedings now under review. If, however, he sustained no professional relation whatever to said proceedings, his participation in a disposition of property by the bankrupts, which the trustee has challenged as fraudulent, would be inseparable from the case; and it is temperate animadversion to say that, giving him the benefit of the least prejudicial of the two alternatives above mentioned, his agency in said transaction cannot be otherwise than grossly offensive to a court of justice.

While I shall not review all the contents of Mr. Dorn's affidavit, there are some things stated therein, which require notice. He says that, when he received the checks in question from De Gottardi & Righetti, he believed they were entirely solvent. How he could have entertained that belief, without closing his eyes to circumstances then apparent, it is difficult for me to understand; and, furthermore, how, in face of the facts that De Gottardi & Righetti were sorely distressed for money to satisfy their creditors, and for many years had been his regular clients, always faithful in the payment of fees, he could, at the most critical emergency of their business career, have exacted from them, partly on past accounts, but mainly as a retainer for future services, over $2,700,—practically all the money they had on hand,— if he believed them to be entirely solvent, is a question to which I can find no satisfactory answer. That part of Mr. Dorn's affidavit devoted to the matter of past indebtedness only confirms the conclusion I first announced on that question, and which was precisely the same as herein stated, namely, "that the bankrupts were not indebted in any amount whatever to Mr. Dorn at the time the checks in question were turned over to him." The statement of his affidavit presumably responsive to this finding is that:

"The firm of De Gottardi & Righetti was indebted to me when I made the trip to Cayucos. The amount, extent, or particulars of that indebtedness are

not fully disclosed by the record before the court. There was no effort made to collect that fee from this money, and I deemed it not necessary or proper to go into that matter fully before the referee, when it was not at issue."

It will be observed that, while he says the firm of De Gottardi & Righetti was indebted to him, he does not name or intimate any amount whatever, and an indebtedness of only $1 would fulfill literally every requirement of his statement. The explanation, of course, is clearly evasive, and a virtual admission of the correctness of the finding. But he says further:

"A claim will probably be presented in this matter on that indebtedness, and, if it is contested, all of the facts in relation thereto will be at issue, and may come before this court for review."

Why does he use the word "probably"? If the claim is just, why should there be any doubt or hesitancy as to its presentation? Moreover, at the time of filing his affidavit, January 25, 1902, nearly five months had elapsed from the date of the referee's order directing him to pay over to the trustee the money ($2,743.94) he received from the bankrupts. This long failure to present the claim, unexplained, and in view of the other evidence relating thereto, ill comports with the idea of its justness. Mr. Dorn's suggestions of lack of notice and opportunity to be heard are without force. On the 22d day of June, 1901, a general reference of this case was made to Wm. D. Stephens, since deceased, but then referee for Los Angeles county, on affidavits alleging, among other things, that said Dorn was attorney for the bankrupts, and charged by the creditors of said De Gottardi & Righetti with having assets in his hands belonging to said firm, and that Louis Lamy, referee for San Luis Obispo county, was so prejudiced in favor of said Dorn that an impartial hearing of the matters to be investigated could not be had before said Lamy. Thereafter, on the 5th day of July, 1901, a notice of motion to vacate said order was filed at the instance of said Lamy, and to this notice, with the names of other attorneys for said Lamy, appears that of said Dorn. In opposition to said motion an affidavit by numerous creditors was filed July 11, 1901, to the effect: That, in the opinion of affiants, the matter of De Gottardi & Righetti, bankrupts, was replete with fraud committed by the bankrupts, and that affiants were informed and believed that Mr. Dorn had been a party to said fraud. That on an examination before some of his creditors at San Francisco, immediately prior to the institution of said proceedings in bankruptcy, De Gottardi declared that he gave about $2,700 to Mr. Dorn on the 1st day of May, 1901; that Dorn claimed $800 for services rendered before that date; "and that he had told Dorn about the robbery, and that he gave Dorn two thousand dollars retainer, to employ detectives, if necessary, and for his advice as to what to do." That said Dorn would be charged with fraud in obtaining said money, and otherwise, and that, owing to the intimate relations between him and said Lamy, the latter could not impartially inquire into and determine said matters. Thus it will be seen that Mr. Dorn, in the earliest stages of these bankruptcy proceedings, was fully advised that searching inquiries were to be prosecuted by the creditors into his dealings with

the bankrupts, and particularly concerning the two checks they transferred to him. Furthermore, the subsequent examination of Mr. Dorn as a witness by the trustee's attorney, in furtherance of said inquiries, was protracted and thorough, and invited from and gave to him every opportunity for full explanations. Mr. Dorn's assumption that the questions of past indebtedness and reasonableness of retainer were not legitimately before the court on this review, but could arise only when claims are made, respectively, therefor, was unwarranted. The chief issues on this review are whether the alleged payments by De Gottardi to a woman and a doctor, and the alleged burglary or the bankrupts' store, were real, or only parts of a scheme to defraud creditors. Manifestly, any fraudulent disposition of property by the bankrupts is pertinent to said issues. When, therefore, the trustee introduced in evidence the transfer of checks to Mr. Dorn, claiming the same to have been a fraud, and the bankrupts sought to justify said transfer on the grounds of past indebtedness to him and a retainer for his future services, these matters became not only proper, but necessary, subjects of inquiry. Mr. Dorn's further assumption that the decision of the referee, ordering him to pay to the trustee, within five days, $2,743.94, money adjudged to be in his possession and belonging to the estate of the bankrupts, and stating that said order was not made upon the ground or theory of fraud, and that at the time Mr. Dorn received the money from the bankrupts he had no knowledge of their insolvency, because unreviewed and final, would be, in the pending proceeding, conclusive of the character of his relations to said money, was unwarranted. The trustee by said decision obtained all the relief he sought, and certainly could not have asked a review on the ground, that, while the order itself was good, the reasons given therefor were unsatisfactory. Besides, the decision expressly recites that findings of fact were waived by the parties, but without that recital the referee's remarks negatory of the ground or theory of fraud could have no greater or other effect than would have been given to an affirmative statement by him, had it been made, of his reasons for the order. Such a statement might be persuasive, but could hardly work an estoppel. Giving to said remarks of the referee, however, the force of an adjudication, they are inoperative here, further than above indicated, for the reason that a judgment in one action cannot be conclusive in another unless the parties to both are the same.

Orders conformably to the views herein announced, affirming the referee's decision, and committing the bankrupts to jail until they comply with the same, or until otherwise ordered by this court, having been already made, the clerk will now enter only an order for the filing of this opinion.