---

## In re RUOS.

(District Court, E. D. Pennsylvania. October 2, 1908.)

### No. 1,093.

1. BANKRUPTCY (§ 224*)—SPECIAL REFEREE—POWERS.

The powers of a special referee, appointed on petition of a receiver for the property of an alleged bankrupt pending a hearing on the petition, with authority to examine the bankrupt and other witnesses in relation to the property and assets of the bankrupt generally, were superseded on the making of an adjudication and an order of general reference.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 224.*]

2. BANKRUPTCY (§ 136*)—ORDER REQUIRING BANKRUPT TO TURN OVER PROPERTY—PROCEDURE TO OBTAIN.

An order requiring a bankrupt to turn over money or property to his trustee should be made only after a hearing on a petition therefor, making definite averments on the subject and offering a definite issue, upon which both parties may adduce evidence.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 136.*]

3. BANKRUPTCY (§ 136*)—ABILITY OF BANKRUPT TO COMPLY.

A finding by a referee that at the time of his bankruptcy a bankrupt had in his possession or under his control money or property of his estate, which he withheld from his trustee, does not warrant an order, seven years afterward, requiring him to turn the same over to his trustee; it not being shown that he is then able to comply with such order.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 136.*]

In Bankruptcy. On reports of special referees, and on motion for an order requiring bankrupt to pay money to trustee.

See, also, 159 Fed. 252.

John C. Swartley and William Stuckert, for trustee.
Francis Shunk Brown and Webster Grim, for bankrupt.

J. B. McPHERSON, District Judge. Unfortunately the true nature of this proceeding seems not to have been clearly realized, with

the result that much time and trouble have been expended in what the court must now declare to be a fruitless effort. When the creditors' petition was filed on September 10, 1901, and amended on September 24th, it averred as the acts of bankruptcy certain fraudulent transfers and concealment of property and a permitted preference through legal proceedings. These averments were denied by the bankrupt in an answer filed on October 3d, but meanwhile, on September 13th, a receiver was appointed to take charge of the bankrupt's property and books of account, and to hold them until further order. On September 23d the receiver presented a petition averring that the bankrupt had recently collected large sums of money for which he had failed to account, and that he had improperly disposed of much of his property. The petitioner stated upon information and belief that the bankrupt had dissipated and used most of his assets, declared that the disposition of these assets could only be ascertained by an immediate examination of the bankrupt, and prayed the court to appoint a special referee to take the testimony of the bankrupt and of other witnesses, in order to discover the whereabouts of the assets. The prayer was granted, and on the same day a special referee was appointed. This action was evidently taken under clause 9 of section 7 (Bankr. Act July 1, 1898, c. 541, 30 Stat. 548 [U. S. Comp. St. 1901, p. 3425]), which requires a bankrupt, when present at the first meeting of his creditors, "and at such other times as the court shall order," to submit to an examination, inter alia, concerning the amount, kind, and whereabouts of his property. The special referee held a meeting on October 3d, at which the examination of the bankrupt was begun. On this day, also, the answer was filed, denying the material averments of the creditors' petition, and apparently a somewhat prolonged controversy was threatened. On October 9th, however, before the second meeting was held, the bankrupt filed a supplemental answer to the creditors' petition, in which he admitted his insolvency and declared his willingness to be adjudged a bankrupt. This was followed by an immediate adjudication and an order of general reference. By this unexpected turn of affairs the special reference was clearly superseded. It was undoubtedly justified on September 23d, when it was evidently not known that the bankrupt would shortly consent to an adjudication; but when this consent was given by the supplemental answer, and the adjudication followed in due course, there was no longer any occasion for a special examination. The whole inquiry was thereupon committed by the statute to the general referee, before whom the bankrupt was bound to appear and to submit to the same examination as was contemplated by the order of September 23d. The only reason for the special reference was the apparent need for an immediate inquiry, which would not then be had in the ordinary course of procedure, since no adjudication had been entered, or apparently was likely to be entered during an uncertain period.

Instead of abandoning the special reference, however, the referee and the parties interested went on with it for 12 or 15 months, taking a mass of testimony, and adding to the confusion by proceeding at the same time with the statutory examination of the bankrupt under the

order of general reference. No one, however, seems to have objected, and the controversy was carried on in a leisurely fashion until June, 1904, when the special referee prepared a report in that capacity, finding that the bankrupt had in his possession, or within his control, "property to the value of at least $4,000 and cash to the amount of at least $10,000, which he should have transferred to the receiver and trustee of his estate" (the receiver having been duly elected as trustee), and recommending that the court order the bankrupt to pay the cash and deliver the property, or pay its value, to the trustee of his estate. He also reported certain facts concerning a transaction between the bankrupt and his brother Joseph, concluding that Joseph had received a preference of more than $11,000, with reasonable cause to believe that a preference had been intended. Exceptions to this report on behalf of the bankrupt and his brother were overruled by the referee on May 24, 1905, and on the following day the report was filed in the office of the clerk. Nothing further seems to have been done until February 20, 1907, when the bankrupt presented a petition to the court, asking that the matter should be re-referred in order that additional testimony might be taken, averring that no part of the property or cash embraced in the recommendation of the report was in his possession or control at the time of the filing of the petition in bankruptcy, or had been since, and praying that the order of re-reference might not direct the referee to make or recommend any order to turn over assets to the trustee. On the same day the court directed this further inquiry to be made, and (evidently overlooking the fact that a regular referee was now in charge of the estate) appointed another special referee to ascertain and report the facts, with the testimony and his findings thereon. This has been done, but the second report does not essentially change the situation as presented by the first referee.

Upon this record the court is asked to make the order recommended by the first report, directing the bankrupt to deliver certain property, or pay its value, and to pay certain cash to his trustee. Clearly, as I think, no such action should be taken. The receiver's petition of September 23d, which is the foundation of the whole proceeding, does not contemplate such an order, but simply asks for a general inquiry concerning the whereabouts of the bankrupt estate. If it had appeared in the course of this inquiry that the bankrupt probably controlled or was possessed of money or property that rightfully belonged to his estate, the correct proceeding to compel delivery would have been begun by presenting a petition making definite averments upon this subject and offering a definite issue. To such a petition the bankrupt would have been entitled to reply, and upon the issue raised by his answer both parties would have had the right to offer evidence, not only that which had been already taken, but such further evidence as might be relevant. The facts would thus appear, and the proper order would have the necessary support. Here, however, there was neither an appropriate petition nor an answer thereto, and therefore no issue to which the evidence can be definitely applied. On such a record I must decline to make an order that might be followed by the imprisonment

of the bankrupt. As was said in Boyd v. Glucklich, 116 Fed., at page 134, 53 C. C. A., at page 454, concerning an analogous situation:

"Dispatch in judicial proceedings is commendable; but in proceedings involving the liberty of a citizen he has a right, not only to be informed of the precise claim against him, but, after receiving that information, he has a right to a reasonable time to prepare his answer and present his proofs, and, lastly, to be heard by counsel on the law and facts of the case. While proceedings in bankruptcy may be summary, they should not be too summary; in other words, they should not be so summary as to deprive the bankrupt of those fundamental rights and privileges that belong to every citizen, among which are the right to be advised of the demand made upon him, and the right, after being so advised, to have a reasonable time to prepare his defense and produce his witnesses. The bankrupt act does not do away with these rights, and no citizen forfeits them by being adjudged a bankrupt. The bankrupt act contemplates that proceedings in bankruptcy shall go forward with all reasonable dispatch compatible with the due and orderly administration of justice and a proper regard for the fundamental rights of the citizen."

So, also, in Re De Gottardi (D. C.) 114 Fed. 332, numerous authorities are collected in support of the proposition that a bankruptcy court has jurisdiction, "on issues properly joined," to determine whether or not a bankrupt has in his possession or under his control money or other property belonging to his estate in bankruptcy, and, "if the issues be found against the bankrupt," to make an order requiring him to pay or deliver to the trustee, etc.

Moreover (whatever may have been the fact seven years ago, when these proceedings were begun), I am by no means satisfied that the bankrupt has now in his possession, or under his control, the money and property referred to in the reports of the special referees, and that he could comply with an order to deliver to his trustee. In such a situation, the duty of a District Court is thus declared by Judge Gray, speaking for the Court of Appeals of this circuit in American Trust Co. v. Wallis, 126 Fed. 466, 61 C. C. A. 344:

"The powers vested in courts of bankruptcy to accomplish the general purposes of the bankrupt law, to wit, to segregate the estate of the bankrupt and provide for its equitable distribution amongst the creditors, are plenary and far-reaching. The court may, by summary order, direct the delivery and turning over to the trustee by the bankrupt, or by any third person holding the same by his order and control, any property which, prior to the filing of the petition, the bankrupt could by any means have transferred, or which might have been levied upon and sold under judicial process against him. For disobedience of such an order the court in bankruptcy undoubtedly has the power, by attachment for contempt, to enforce compliance with such order, and punish refusal to comply. This power, however, is far-reaching and drastic, and must be exercised with cautious discretion. If the bankrupt denies that he has possession or control of the property, or, if a third person in possession thereof claim to hold it, not as the agent or representative of the bankrupt, but by title adverse to him, and there is no evidence to indisputably show that such denial or claim is false or fraudulent, and that the case is one of simple concealment or refusal on the part of the bankrupt, or the one in possession, to deliver up the property as ordered, it would be an unwarranted stretch of power on the part of the court to resort to a summary proceeding for contempt for the enforcement of its order. In the absence of fraud or concealment, the bankrupt court can only order the delivery of property to the trustee which the bankrupt is physically able to deliver up, having the same in his possession or control. If it shall appear that he is not physically able to deliver the property required by the order, then, confessedly, proceedings for contempt, by fine and imprisonment, would result in nothing, certainly not

in compliance with the order. The contempt in this case could only be purged by a reiteration of the physical impossibility to comply with the order whose disobedience is being thus punished. An order made under such circumstances would be as absurd as it is inconsistent with the principles of individual liberty."

The motion to direct the bankrupt to deliver and pay must be refused.